**THE MAINE CENTRAL RAILROAD COMPANY and the Portland Terminal Company, Plaintiffs,**

v.

**BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES, Defendant.**

**Civ. No. 86–0366–P.**

United States District Court, D. Maine.

July 29, 1988.

---

Randolph Lee Elliott, Richard T. Conway, Ralph Moore, Shea & Gardner, Washington, D.C., Charles S. Einsiedler, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, Me., for plaintiffs.

John O'B Clarke, Jr., Highsaw & Mahoney, Washington, D.C., Craig J. Rancourt, Biddeford, Me., for defendant.

## OPINION

GENE CARTER, District Judge.

In this action Plaintiffs seek to impeach an arbitration award entered on October 30, 1986 as a resolution to a long labor dispute between the parties. By order dated June 3, 1987, this Court granted Defendant's motion for summary judgment on Counts II, III, IV, and V, but denied the motion as to Count I, which alleges that the arbitrator failed to provide a fair hearing. Count I was tried to this Court, without a jury, on July 14, 1988.

Review of arbitration awards under the Railway Labor Act is "among the narrowest known to the law." *Union Pacific Railroad v. Sheehan*, 439 U.S. 89, 91, 99 S.Ct. 399, 401, 58 L.Ed.2d 354 (1978). The RLA explicitly permits impeachment of an award only in three situations: if

(a) ... the award plainly does not conform to the substantive requirements laid down by this chapter for such awards, or that the proceedings were not substantially in conformity with this chapter;

(b) ... the award does not conform, nor confine itself, to the stipulations of the agreement to arbitrate; or

(c) ... a member of the board of arbitration rendering the award was guilty of fraud or corruption; or ... a party to the arbitration practiced fraud or corruption, which fraud or corruption affected the result of the arbitration.

45 U.S.C. § 159 Third. Implicit in the statute is the power of the Court to review the proceedings for violations of due process. *Brotherhood of Locomotive Engineers v. St. Louis Southwestern Ry.*, 757 F.2d 656 (5th Cir.1985); *Southern Pacific Co. v. Wilson*, 378 F.2d 533 (5th Cir.1967).

Section 7 Third of the RLA, 45 U.S.C. § 157 Third (b) provides that:

The board of arbitration shall organize and select its own chairman and make all necessary rules for conducting its hearings: *Provided, however,* That the board of arbitration shall be bound to give the parties to the controversy a full and fair hearing, which shall include an opportunity to present evidence in support of their claims, and an opportunity to present their case in person, by counsel,

or by other representative as they may respectively elect.

Plaintiffs allege that the arbitration award should be invalidated because the arbitrator failed to conform with this provision of the RLA and failed to conduct the hearing in accordance with constitutional due process requirements. Specifically, they allege that the arbitration board denied them the opportunity to present evidence on their claim that certain individuals were not eligible for the protective allowances which had been recommended by Emergency Board 209 *for all employees "currently active"* on March 3, 1986, the day the underlying strike began.

### Findings of Fact

In determining whether Plaintiffs had an opportunity to present evidence in support of their claims,[1] the Court finds the facts, as developed in the documents and the testimony presented, as follows.

Job protection was a major issue precipitating the union's strike against the railroad. In its report concerning resolution of that strike, Presidential Emergency Board 209 recommended that the railroad's proposal for job protection for those employees currently active on March 3, 1986 be accepted, the protective allowance to be $26,000. The union had asked for, and finally received in July, a list of those employees the railroad thought were eligible for protection. The union sought information from the railroad to verify the accuracy of the list, and there was some discussion among the parties that there might be other eligible employees. Tr. 30.

On September 30, 1986, Congress passed, and the President signed, Public Law 99–431, making the Emergency Board's recommendation binding on the parties and mandating binding arbitration if implementing issues remained unresolved more than ten days after the date of the law's enactment. One such issue was the eligibility of employees for protection.

The union submitted a proposal for resolution of the outstanding issues to the railroad. The proposal included the same list of employees previously prepared by the railroad as a list of employees in active service on March 3, 1986, and a proposal for determining eligibility of other individuals. Shortly thereafter, the railroad submitted its proposal, which included the same list with eleven names deleted. The deletions had been made by Bradley Peters, the railroad's Director of Human Resources, and represented people not considered by the railroad to be eligible for protective benefits.

On October 9, 1986, the parties met to try once again to resolve the remaining problems. At that meeting, the union contested the accuracy of the list the carrier had provided and asserted that more people were eligible under the statutory definition than those on the list. Tr. 36–37, 85. At the meeting, the union specifically discussed the issue of vacation as bearing on eligibility determinations under the "currently active" definition. William LaRue, the union's vice-president, also specifically addressed the circumstances of employees Coffin, White, and Emerson, telling the railroad's representatives at the meeting that those individuals were on vacation, were paid for vacation, and "therefore they were on the payroll and under pay on March 2nd." Tr. 87.

As a result of the dispute over eligibility of various individuals, at the October 9 meeting the parties decided to present the issue to the arbitrator in the form of three questions to which they both agreed. Tr. 86–87. The question presented to the arbitration board pertinent to the issue now being tried was:

(b) Does Recommendation No. 1 as set forth in the EB 209 Report, disqualify an employee for job protection when such employee was not working on the property on March 3, 1986, but was under pay

---

**1.** In this case, the constitutional due process requirement is coterminous with the statutory due process requirement, so the inquiry is the same for both of Plaintiffs' allegations. *See, e.g., Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 433, 102 S.Ct. 1148, 1156, 71 L.Ed.2d 265 (1982) ("The Due Process Clause grants the aggrieved party the opportunity to present his case and have its merits fairly judged.")

by the Carrier by virtue of payment for vacation, personal leave, suspension, sickness, injury, etc.?

The railroad's representatives at the October 9th meeting reported to Mr. Peters on the topics discussed at the meeting. They told him that the union had claimed that more people than those originally listed were eligible for protection and that particular names had been discussed. Tr. 36–37. Peters suspected that at the arbitration hearing the union would present a claim for protection for those extra people. Tr. 37. Peters apparently was not told the specific names of Coffin, White and Emerson.

The procedure set for the arbitration hearing included the presentation of written submissions. Bradley Peters was the official charged with preparing the railroad's submission. Although he suspected that the union might present protection claims for individuals other than those on the list, Peters affirmatively decided not to include any evidence dealing with people that the union might contend were eligible but were not already named on the list, Tr. 38, because he did not want "to introduce evidence that would provide a basis for employee protection which did not exist in some other form." Tr. 39. Neither party saw the other side's submission until the day of the arbitration hearing. The union's submission contained information sheets on twenty-four individuals whose eligibility was disputed, including Coffin, Emerson, and White, as well as one other person, Henry, disputed because of his vacation status. Plaintiffs' submission suggested eight categories of disputed workers on the initial list and discussed the circumstances of the individual workers they had sought to delete from the list.

The arbitration hearing mandated by Public Law 99–431 was held on October 20–21, 1986. The arbitration board consisted of two partisan members, Robert Rice for the railroad and William LaRue for the union, and neutral arbitrator Arthur Van

Wart. The hearing was in the form of a group discussion rather than a formal presentation of evidence, and arbitrator Van Wart administered the oath to all participants at the beginning of the proceeding.[2]

At the hearing on October 21st, Mr. Peters said that based on previous discussions, he had thought the union would come up with four or five additional individuals that "they claimed were sick, on vacation or whatever." Jt.Ex. 1 at 40. He expressed surprise that the union, in its submission, had proposed twenty-five [actually twenty-four] names and said that although he knew the circumstances of most of those proposed, there were a few question marks. There was both general discussion of how the arbitrator should decide which employees were to be considered protected and some more specific discussions of individual cases. The arbitrator asked whether the three questions posed in the union's submission covered the various categories of disputed workers, and the railroad agreed that they did. *Id.* at 42, and Ex. 3 at 15.

At the proceedings on October 21st, there was continued discussion about how the arbitrator would resolve the protection issue. When the railroad's representatives suggested that he was to determine the names of individuals who are to be given protective benefits, he stated that he did not view that as his role. He stated that he did not have the time to go over those issues. Jt.Ex. 2 at 114. Peters then said that the railroad had no problem with the arbitrator devising concepts of the individuals as long as the concepts were nailed down. *Id.* at 116. The arbitrator then stated that he would not say whether he was doing that or not, but that he would try to follow the dictates of the Emergency Board. Tr. 116. Peters then presented information about people off sick, including a Danny Danio, initiated a discussion of the distinction between Mr. Hall, Mr. Lawson, and Mr. Brach, and related what he had learned about Mr. Card. The latter four

---

**2.** At the time of the summary judgment motion, there was no record of the procedures before the arbitration board. For purposes of this trial, the parties have submitted partial transcripts of the proceedings.

individuals had been dealt with in the union's submission. Id. 117–123. The arbitrator then asked if the parties had anything to add on this item. After someone responded no, the arbitrator proceeded to other matters.

At the end of the arbitration, someone, identified on the transcript as "Voice" but who presumably was arbitrator Van Wart, asked again if anyone had anything to say. Id. at 163. Peters stated that most of the information on the twenty-four information sheets was correct and objected weakly to the editorial cast of it. Peters then stated that the arbitrator did not want to get into that, to which the arbitrator agreed. Peters went on to state that the points of dispute were "not substantive." Id. at 164. In response to Mr. Van Wart's reply that time was of the essence, Peters said, "Fine." Id. at 165.

At the end of the hearing the arbitrator did not request post-hearing submissions, and neither party asked for the opportunity to make another written submission, although such filings are sometimes employed. Tr. 69, 100.

On October 30, 1986, an executive session was held to review the arbitration award drafted by arbitrator Van Wart. The parties had seen the award prior to the session. The parties had the opportunity to make objections to the award. The union made objections which were rejected, and Mr. Rice of the railroad continued his objection to the constitutionality of Public Law 99–431 and said that he might have something else later. In the award the arbitrator found the term "then currently active employees" to be a term of art "covering active employees over whom Carrier had control and direction. This would include employees on 'vacation' and under 'discipline' but would exclude employees off with 'injuries' and 'illnesses.'" Ex. 3 at 13.

The award set forth the railroad's submission concerning categories of disputed employees and the persons filling those categories and discussed those categories in light of the arbitrator's response to the three questions that had been proposed by the union and agreed on by the railroad as covering various categories of disputed employees. The award dealt with all of the categories (and people therein) submitted by the railroad. The award stated in pertinent part: "The qualified conclusion finds as 'then currently active employees' those employees who were on a disciplinary suspension; *i.e.,* Messrs. Coffin, Emerson, Henry and White as vacationists and Murphy and Tracey, who were suspended respectively." Ex. 3 at 16. The award also categorized the twenty-four persons from the union's information sheets (many of whom were the same as those presented in the railroad's categories), stating in pertinent part: "4 *on vacation*—found to be protected (Coffin, Emerson, Henry, and White)." *Id.* at 17.

### Discussion

■ Plaintiffs contend that they were precluded from presenting evidence about employees Coffin, Emerson, Henry, and White that would have convinced the arbitrator that they were miscategorized as vacationists for purposes of the second question, and that they were therefore denied both due process and a full and fair hearing under section 157. The Court cannot agree. Because the arbitrator's three guiding questions were formulated at the meeting of October 9, 1986, Defendants knew by then that the issue of whether people on vacation would be considered eligible for protective benefits would be submitted to the arbitrator. The union had also specifically raised the names of employees Coffin, White, and Emerson at that October 9th meeting. By the time they began preparing their written submissions for the arbitrator, therefore, Plaintiffs knew that the union would be claiming protective benefits on the basis of vacation status for individuals like Coffin, White, and Emerson. They had the same opportunity that the union had to discuss in the submission requested by the arbitrator both the category of vacation and/or the individuals whose names had been, or might be, raised as in that category. The submissions were plainly considered by the arbitrator and the information presented

and argued there served in part as the basis of his award. Specifically, he discussed the categories and people filling them as set forth by the railroad, and considered and categorized the disputed persons listed by the union. Plaintiffs affirmatively chose not to present information regarding certain individuals whose protected status was in dispute although they knew about Defendant's position regarding people on vacation and even the names of people claimed to be in that status.[3]

At the arbitration itself, evidence was not taken in the traditional mode. The parties discussed the situations of a number of employees, footnoted in the railroad's submission as disputed, and listed on the union's information sheets. *See, e.g.,* Jt.Ex. 1 at 17.

Early in the hearing, during the initial discussion of the job protection issue, the railroad, through Mr. Rice, took the position that the Emergency Board used the term "currently active employees" to mean those physically working, Tr. 26, and meant specifically to exclude those who were on vacation. Jt.Ex. 1 at 27–30. The union took the position that currently active meant on the payroll. The arbitrator fully heard the railroad's argument on the vacation issue. At the time the railroad set forth its position, it knew from the prior meeting what the union's position on vacation was and the names of at least three individuals the union considered exemplars of that category. It was not surprised by a new argument by the union. *See L.R. Foy Construction Co. v. Spearfish School District,* 341 N.W.2d 383, 386 (S.D.1983). It had information concerning these individuals within its control. It should have been clear to the railroad that the individuals the union sought to protect as vacationists had been furloughed and had taken vacation accrual.

If the railroad had wanted to articulate a fall-back position that delineated between individuals taking vacation accrual and those taking regularly scheduled vacation, to be employed if the arbitrator decided that vacationists were eligible for protection, it had the opportunity to do so. The position it chose to take, however, was that people on vacation were not eligible for protection, without providing any definition of vacation.

At the hearing Peters addressed the Defendant's information sheets on disputed individuals, saying he knew the circumstances of most of the individuals but had question marks about a few. Peters did not then seek to address further any of the contentions made regarding individuals but said that his point regarding extra individuals proposed by the union was that if some were added to the list of active employees, others would have to be deleted. Jt.Ex. 1 at 42. The railroad then agreed that the question submitted by the union covered the various disputed categories, Ex. 3 at 15; Jt.Ex. 1 at 42. There is no indication that Peters or any other railroad representative tried to qualify question (b) further as it concerned vacationists or to explain it to the arbitrator. Although there was some discussion of individual situations at the October 20th session, with Peters volunteering some of the information, he did not try to volunteer any of the information that he then possessed on the four persons who were listed as on vacation. *See, e.g.,* Tr. 47.

On October 21st, when the arbitrator stated that he was not going to decide a specific number of protected individuals, Peters did ask him to make a determination of individuals entitled to protection. He responded that that was not his role and that he did not have the time. Shortly thereafter, however, an appreciable amount of discussion ensued on the circumstances

---

**3.** Mr. Peters testified that the fact that there were people who were on vacation who had had their jobs abolished only became relevant on October 20, "when the list that was prepared was shown." Tr. 13. Although it appears that Mr. Peters was not told the names of the individuals who had been broached at the October 9 meeting as vacationists, this miscommunication among the railroad's representatives does not negate the corporation's knowledge of information gained at the earlier meeting. *See, e.g., Continental Oil Co. v. Bonanza Corp.,* 706 F.2d 1365 (5th Cir.1983).

of specific individuals, much of it initiated by Peters. There was talk of four people off sick, including a Danny Danio, Jt.Ex. 2 at 117, and a long discussion of a Mr. Brach, with reference to Mr. Lawson and Mr. Hall. *Id.* at 118–122. In addition, Peters, apparently reporting his overnight research on Mr. Card, stated: "Mr. Card, there was a question about Mr. Card, C–A–R–D, and whether he, in fact, was recalled to work and I said I didn't know and I have confirmed that he was, in fact, recalled for one week. It fell through the cracks candidly, if you want to know the bottom line." *Id.* at 123. Clearly, although there was a hesitancy on the part of the arbitrator to engage in "extensive arbitration over each individual name," *id.* at 115, Mr. Peters and others did offer pertinent information or evidence and were not prohibited from doing so by the arbitrator.

Later in the hearing, in general response to the question whether anyone had anything to say, the following exchange between Peters and the arbitrator took place:

> Mr. Peters: The only other issue that I would raise is that we ... although to the best of my quick analysis their list of twenty-four employees was reasonably correct as far as information, there is some of it that has been presented in an editorial way to influence you, which I would expect either of us to do, which we could argue about for the rest of the day.
>
> Mr. Van Wart: Um Hmm.
>
> Mr. Peters: If you care to do that and you have already said that you don't care to do that....
>
> Mr. Van Wart: No, no.
>
> Mr. Peters: They are not substantive areas.
>
> Mr. Van Wart: Time is of the essence and I—the little time I've got."
>
> Mr. Peters: Fine.

This cannot be characterized as a denial of due process by the arbitrator. Peters' description at the hearing of the "evidence" he now claims he wanted to present was equivocal at best. He described the union's information as reasonably correct, and objected merely to its editorial cast and then stated that he had nothing "substantive" to add. He suggested that by giving the competing editorial cast to the information he would provoke lengthy argument over something that was not a substantive area. Plaintiffs were not prevented from presenting evidence.[4] Rather, the arbitrator agreed with Mr. Peters that he did not want to or have time to hear argument "for the rest of the day" about something Peters was characterizing as unimportant.[5]

---

**4.** Mr. Peters testified at trial that he attempted to explain to Arbitrator Van Wart the status of the four individuals now being challenged, but Van Wart *precluded him from doing so.* The railroad suggests that the Court must accept this statement as uncontroverted. The Court disagrees. Before the Court now are Joint Exhibits 1 and 2, stipulated to as transcripts of part, but not all, of the arbitration proceedings. The Court has reviewed these exhibits very carefully and is satisfied that at least as far as the parts of the proceedings regarding job protection are concerned, the transcriptions are virtually complete. There are, of course, a few of the inaudible and tape-skip notations that are the weakness of this type of recording method. However, no representation was made to the Court that the transcripts have major gaps and the context of the transcripts themselves do not indicate that any large portion of the proceedings remained untranscribed. No representation was made to the Court that the attempted offer and exclusion of evidence occurred off the record. The Court is confident, therefore, in relying on the transcript as providing evidence contrary to that provided by Mr. Peters.

After close scrutiny of the record, the Court finds that the only point in the proceeding at which Peters could be construed as having attempted to offer evidence on the status of the four individuals is that quoted above in the text. For the reasons discussed in the text, the Court rejects characterization of what occurred as the arbitrator precluding Plaintiffs from presenting evidence.

The Court must also say that on the basis of its careful reading of the transcript, it cannot view the arbitrator as unwilling to receive any information presented in manageable form. The transcript shows Mr. Van Wart to have been receptive to information presented and not to have curtailed discussion as it was ongoing.

**5.** In *Consolidated Edison Co. v. National Labor Relations Board,* 305 U.S. 197, 226, 59 S.Ct. 206, 215, 83 L.Ed. 126 (1938), the Supreme Court found that a hearing examiner acted unreasonably and arbitrarily when he excluded evidence after an offer of proof had been made showing the testimony to be highly important and capable of being presented without any undue delay in the closing of the hearing. Even if the arbi-

Neither Peters nor any other railroad representative then attempted to present in conceptual, rather than particularized, form the evidence that is claimed to have been excluded. No argument was presented to the arbitrator that the category of vacation was not unitary but encompassed two groups of people: those taking scheduled vacations and those taking vacation accrual. Tr. 68.

The Court does not accept Plaintiffs' argument that they relied on the arbitrator's representation that he would not make individual determinations and therefore did not press their offer further. Plaintiffs had agreed that the arbitrator should address the vacation issue as posited in question (b) and they knew that there was a dispute over whether the concept of vacation included vacation accrual as well as scheduled vacations. In fact, at the close of the hearing on the twenty-first, the railroad's position was that none of the disputed individuals was on vacation, as the railroad defined vacation. Tr. 68. Plaintiffs knew, therefore, that there was a good possibility the arbitrator would reach a decision, i.e., that vacationists were protected, that would in essence have been a useless waste of time since in fact nothing would have been decided and all would be left for further arbitrations.

Although Plaintiffs have characterized the issue on which they wished to present evidence as one of whether the four individuals in question were, in fact, on vacation, Plaintiffs' Memorandum at 12, it is plain that what was at issue was a conceptual matter regarding the definition of vacation as it relates to the term "currently active employee." Peters did not need to present evidence about individuals and argue all day. He needed to make a simple point about the definition of vacation that could be illustrated, if further explication were required, by reference to individuals.

This Court is not persuaded that the arbitrator would have rejected Peters' information, even in individualized form, if Peters'

presentation of it had been a forceful and direct offer rather than a flaccid and ambiguous non-offer. It is plain to the Court, however, that the information could as readily have been conveyed in far more acceptable form, i.e., conceptually, and that Plaintiffs, if they thought the point was material, as they now claim, had an obligation to so present it in order to give the arbitrator's decision-making process on this issue some meaning. There is no indication that the arbitrator would have had any hesitancy about accepting such information if it had been presented in conceptual form. In fact, early in the proceeding, he had virtually invited such discussion, stating: "I don't know how you can say a person that is on vacation isn't active." Jt.Ex. 1 at 29.

The Court notes that Plaintiffs did not request to file posthearing submissions in order to attempt to present the evidence they claim was excluded, even though such submissions are sometimes employed. Moreover, having reviewed the award prior to its signing, they did not, at the executive session, object to it on the basis that material evidence had been excluded. These facts indicate that Plaintiffs may have most accurately reflected their perception of the information they wanted to present when they told the arbitrator it was merely editorial and not substantive.

The Court cannot find on the record before it that Plaintiffs were denied a full and fair hearing. They had an opportunity to present the evidence in their submissions that they now claim was excluded, and they knew both that vacation would be an issue and the names of three individuals Defendant would claim were on vacations. The hearing itself was extremely informal, and the Court is not convinced that if Plaintiffs had attempted in a direct fashion to present even the individual evidence, they would have been rebuffed. Several times after the arbitrator had indicated an unwillingness to get into protracted argument over individual circumstances, Mr. Peters raised

trator's actions here are to be construed as a rejection of proffered evidence, his actions were not unreasonable since the proffer, such as it

was, showed the information to be neither important nor capable of concise presentation.

such circumstances and discussion ensued without serious complaint or expression of disapproval from the arbitrator.

Finally, it is clear to the Court that the evidence Plaintiffs claim they sought to produce could have been aptly and concisely presented in conceptual form. In fact, Plaintiffs' counsel made just such a presentation in his opening argument in trial. Plaintiffs did not, however, attempt such a conceptual clarification at any time during the proceeding, although the opportunity was clearly available on the first day, when a discussion of vacation occurred, and on the second, when the arbitrator had asked if anyone had anything else to say. Plaintiffs had an opportunity to present evidence in support of their claims and received a full and fair hearing. 45 U.S.C. § 157.

Accordingly, it is ORDERED that judgment shall be entered in favor of Defendant on Count I of the Complaint.

So ORDERED.