The MAINE CENTRAL RAILROAD
COMPANY and Portland Terminal
Company, Plaintiffs, Appellants,

v.

BROTHERHOOD OF MAINTENANCE
OF WAY EMPLOYEES,
Defendant, Appellee.

The MAINE CENTRAL RAILROAD
COMPANY, et al., Plaintiffs,
Appellants,

v.

BROTHERHOOD OF MAINTENANCE
OF WAY EMPLOYEES,
Defendant, Appellee.

Nos. 87–1524, 88–1876.

United States Court of Appeals,
First Circuit.

Heard Feb. 8, 1989.
Decided April 26, 1989.

Dorothy Eugenia Langan with whom Richard T. Conway, Ralph J. Moore, Jr., Cynthia W. Simon, Shea & Gardner, Washington, D.C., Charles S. Einsiedler, Jr., and Atwood, Scribner, Allen, Smith & Lancaster, Portland, Me., were on briefs, for plaintiffs, appellants.

John O. Clarke, Jr., with whom Janet K. DeCosta and Highsaw & Mahoney, P.C., Washington, D.C., were on brief, for defendant, appellee.

Before BOWNES, Circuit Judge, COFFIN, Senior Circuit Judge, and TORRUELLA, Circuit Judge.

COFFIN, Senior Circuit Judge.

This is an appeal by plaintiffs, Maine Central Railroad Company and Portland Terminal Company (collectively, the Carrier), from the granting of summary judgment to defendant, Brotherhood of Maintenance of Way Employees (BMWE, or the Organization),[1] on plaintiffs' petition to set aside an award by a statutorily authorized Arbitration Board, 663 F.Supp. 425 and 691 F.Supp. 509. The present issues are whether the Board exceeded the bounds of its authority under the report and recommendations of Emergency Board 209 in (1) requiring that lump sum payments as arrived at through national bargaining by BMWE and certain railroads, not including the Carrier, be assumed as obligations by the Carrier, (2) in establishing per diem rates for newly authorized system-wide maintenance production crews, and (3) in effecting a moratorium on additional proposals concerning the issues resolved by the Arbitration Board.

## I. Evolution of the Litigation

This litigation, involving as it does, an order of the President, two statutes passed by Congress, a Congressional Advisory Board recommendation, an Emergency Board recommendation, and an Arbitration Board's binding award, cannot be understood properly without a tracing of its significant stages.

1. The basic dispute was framed by the serving of "section 6 notices" under section 6 of the Railway Labor Act, 45 U.S.C. § 156, by both BMWE and the Carrier in April and September of 1984. BMWE sought changes in the collective bargaining agreement that would give additional protection to employees, specifically, separation allowances to those displaced by technological and other changes. The Carrier

---

1. Portland Terminal Company, at all times relevant to this appeal, was a wholly owned subsidiary of Maine Central, which in turn was a wholly owned subsidiary of Guilford Transportation Industries, Inc. (Guilford). Guilford also owned two other railroads, the Boston and Maine Corporation and the Delaware and Hudson Railway Company. BMWE was the labor organization representing the craft and class of the Carrier's maintenance of way employees.

sought changes to allow maintenance crews to service needs on a system-wide basis, not merely within four discrete seniority sections, such new groups to be called System Production Maintenance Crews.

2. Mediation ensued in 1985 under the auspices of the National Mediation Board but proved unsuccessful. BMWE declined arbitration and instead initiated a strike on March 3, 1986. By April 10, 1986, it had begun picketing on several railroads outside the Guilford system.

3. On May 16, 1986, the President, in Executive Order 12557, established Emergency Board 209 to investigate and report. Before the Board reported, the Carrier, on May 24, 1986, filed new Section 6 notices, asking for major changes in the bargaining agreement and in the Railway Labor Act and the Railroad Retirement Act. The changes would have eliminated all craft and class lines as well as all restrictions on contracting out work. Faced with such requests for "dramatic changes," as Guilford's president characterized them, the Board sought an agreed upon extension of time to report to the President. The Carrier refused to join the request.

4. On June 20, 1986, Emergency Board 209 filed its report. It declined the sweeping review sought by the Carrier in its poststrike notice and addressed the narrow issues leading to the strike and formation of Emergency Board 209. On the BMWE issue of job protection, the Board recognized both the need of the Carrier to mechanize its maintenance of way operations and the claim of affected employees that they were given disparate treatment compared to clerical and other employees. The Board recommended acceptance of the Carrier's March 2 proposal of a $20,000 lump sum separation allowance for currently active employees, as modified by a BMWE counter-proposal of $26,000.

On the Carrier's issue of System Production Maintenance Crews, the Board recognized the right of the Carrier to establish such crews but also deemed valid BMWE's concern that the new crews should not perform "normal, day to day, maintenance work" that could be efficiently handled by the employees of the several districts. Insofar as compensation was addressed, the Carrier had simply proposed a per diem allowance, without quantification. BMWE had proposed "various levels of travel allowance and expenses associated with meals and lodging." The Board recommended that the parties negotiate an agreement for the new system-wide crews similar to those agreements in effect on Guilford's other railroads, the Boston & Maine and the Delaware & Hudson, but with the proviso that the per diem allowance should not be less than that being paid "maintenance of way employees under other agreements or arrangements throughout the Guilford System."

The Board also addressed two issues that had not been the focus of specific proposals —one involving "changes in rates of pay and health and welfare programs," the other, "local rules and working conditions." As for the former, the Board observed that both BMWE and the Carrier had served notices identical to those served on a national basis and that historically both parties had participated in, or had agreed to be bound by, concerted national handling. It therefore recommended that "consistent with the parties' proposals of March 2 and 3, 1986 [2] and in view of their past practice the parties should agree to be bound by the results of the national negotiations involving rates of pay and health and welfare programs." Regarding changes in local work rules and working conditions, the Board noted the exchange of views between the Carrier and BMWE in which the Carrier indicated its preference for dealing with these issues "on a local basis." It

---

2. These proposals were a handwritten notation added on March 3 by the Carrier as a ninth item to its March 2 list: "[Wages & Health and Welfare on the basis of national handling & effective upon ratification.]"; and a reported submission by BMWE that, although it had included no specific item for back pay allowances, "a notation was made on the Carrier proposal to show that the total question of wages, including the issue of back pay allowances would be subject to the outcome of national negotiations."

therefore recommended that the parties agree to handle changes in work rules and practices noticed before Executive Order 12557 "under the orderly and peaceful procedures of the Railway Labor Act ... without resort to self-help."

5. On August 21, 1986, with mediation efforts following the Emergency Board's report failing, the Congress authorized an Advisory Board to report on progress, if any, and to make findings and recommendations. Public Law 99–385.

6. On September 8, 1986, the Advisory Board filed its report. This Board concluded that the Carrier's refusal to accept Emergency Board 209's recommendations was not, as Carrier had contended, based on financial exigency. Being still somewhat optimistic over the "cooperative approach" manifested by both sides, the Board recommended that the parties be given until the end of the month to reach an agreement, with the still unsettled issues to be submitted to binding arbitration at that time.

7. On September 30, 1986, PL 99–431 was enacted, decreeing that "the report and recommendations of Presidential Emergency Board Numbered 209 shall be binding on the parties and shall have the same effect as though arrived at by agreement of the parties" and that "if there are unresolved implementing issues," the parties shall enter into binding arbitration to resolve them.

8. Finally, on October 30, 1986, the Arbitration Board issued its award, which the district court enforced on June 3, 1987.

## II. Threshold Question

*Standard of Review.*

■ Appellee has accurately described the statutory framework of our review:
Section 3(B) of Public Law No. 99–431, 100 Stat. at 988, expressly provides that if it were necessary to arbitrate, "such arbitration shall be conducted as if it were under section 7 of ... [the Railway Labor] Act, and any award of such arbitration shall be enforceable as if under section 9 of such Act." Thus, in reviewing the award, the district court was required by Section 9 Third of the Railway Labor Act, 45 U.S.C. § 159 Third, to affirm the award unless appellants satisfied one of the three specific grounds for impeachment set forth in Section 9 Third. Only one of those grounds is relevant here, and that is: "That the award does not conform, nor confine itself, to the stipulations of the agreement to arbitrate...." 45 U.S.C. § 159 Third(b).

The applicable case law is well known. Judicial review of an arbitration award is among the narrowest known in the law. *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960); *Local 1445, United Food and Commercial Workers v. Stop & Shop Companies*, 776 F.2d 19, 21 (1st Cir.1985); *Bettencourt v. Boston Edison Co.*, 560 F.2d 1045, 1048–49 (1st Cir.1977). *United Paperworkers v. Misco*, 484 U.S. 29, 108 S.Ct. 364, 371, 98 L.Ed.2d 286 (1987), is our most recent beacon:

> The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract.

108 S.Ct. at 371.

We recognize that the arbitration in this case was not of garden variety. It was the culmination of a most deliberate, sustained, and painful intervention on the part of the executive and legislative branches in a dispute significantly affecting interstate commerce. The language of Section 9 Third governing standard arbitration disputes under the RLA comports, however, with causes of such moment in mandating that an award is to be "construed liberally by the court, with a view to favoring its validity, and that no award shall be set aside for trivial irregularity or clerical error, going only to form and not to substance." 45 U.S.C. § 159 Third (c).

We nevertheless note the significant governmental attention received by this dispute, not to signal the need for a different

standard from that applying to arbitration following no governmental involvement, but to underscore the importance in such a case of a reviewing court resisting any temptation to put on blinders and scrutinize words and phrases through a kind of tunnel vision. When a railroad labor dispute has worked its way through so many stages, the demarcation of issues in any authorizing language cannot be fairly discerned without considering them in the light of their background and evolvement. This perception underlies our ultimate conclusion that appellants have taken too refined and myopic an approach.

### III. Discussion of Issues

#### A. *Lump Sum Payments*

■ In response to Emergency Board 209's Third recommendation, that, "[c]onsistent with the parties' proposals ... and ... past practice, the parties should agree to be bound by ... national negotiations involving rates of pay....," the Arbitration Board found that "lump sum payments" were covered by the Emergency Board's report and that "rates of pay" could not be restricted to their formal meaning in the RLA. This conclusion was based in part on the fact that "lump sum payments" as referred to under "Article I—Wages" of the BMWE national settlement "served to contribute to the basis for the agreed upon rates of pay therein."

The Carrier points out, however, that "lump sum payments," although under "Wages" in the national agreement, is distinguished from "rates of pay." It argues, therefore, that because the Emergency Board's Third Recommendation mentioned only "rates of pay" and not lump sum or retroactive payments, it cannot be interpreted to cover the latter type of payment.

The Carrier recognizes but discounts, however, BMWE's argument that both parties discussed lump sum payments before the Emergency Board. Indeed, after passage of PL 99–431, the Carrier in an October 6, 1986 proposal to BMWE included a provision for lump sum payments under the general caption, "wages." While the actions of the parties cannot determine the

scope of arbitration, they take on significance when we take note of the careful reference in the Emergency Board's Third Recommendation to the "proposals" of the parties on March 2 and 3, 1986. These, as we have recorded in footnote 2, were framed in terms of "wages" and included back pay allowances. In short, given the reference to the parties' proposals, the Emergency Board was arguably using "rates of pay" loosely to include other items relevant to "wages" such as retroactive lump sum payments. We need not say that this interpretation of the Emergency Board's language is the only possible one, or even the preferred one. But we have no doubt that the Arbitration Board's determination that "rates of pay" should not be narrowly confined to its formal statutory meaning is a viable, permissible interpretation. Such a judgment has to be the end of our inquiry. *United Paperworkers v. Misco*, 108 S.Ct. 364.

#### B. *Per Diem Allowance for System Production Maintenance Crews*

■ Here, too, the Carrier's argument falls short of demonstrating that the Arbitration Board's interpretation of the Emergency Board report was impermissible. The report had two relevant provisions. One was that there should be a comprehensive agreement governing System Production Maintenance Crews similar to those agreements on the Boston & Maine and Delaware & Hudson. The other said that the per diem allowance for these new system crews should not be less than that currently paid to maintenance of way employees throughout the Guilford System.

The Carrier argues that this "not less than" language had as its object only system production maintenance crews, and not "maintenance of way employees" in general. In the Carrier's view, therefore, both provisions taken together dictate that the allowance for the new system crews must be similar only to those paid other *system* crews. This is an interpretation of the Emergency Board's prescription but not the only reasonable one. We find it just as reasonable to assume that the Emergency

Board's intention was for these new system crews to receive a per diem allowance in accord with that received by maintenance of way employees in general, not just system crew workers.

Accepting this interpretation as permissible, it then of course would be logical to assume that, in a situation where system employees receive a smaller allowance than BMWE employees generally, the text specifically governing *per diem* rates should supercede the Emergency Board's recommendation governing system crews generally. Thus, the arrangements governing the new system crews should be similar to those covering existing system crews, *provided* that the per diem allowance not be less than that paid to maintenance of way employees generally.

The per diem allowance for the only then extant System Production Maintenance Crews, those on the Boston & Maine, provided $12.75 per day for food and lodging and $4.50 for travel expenses for weekend trips. When the Arbitration Board looked at the basis for these figures, it found that they were based on non-updated 1972 figures stemming from Arbitration Award No. 298. This Award also covered maintenance of way employees in all other roads in the Guilford system; but the figures for employees in these entities had been updated in successive national agreements (to June of 1984) to $21.75 per day for meals and lodging. And the 1986 national agreement, though not participated in by the Guilford roads, added $1.75, to reach a total allowance of $23.50, the figure ultimately settled upon for the new system crews. By the same token, 1972 mileage rates of 9 cents a mile having risen to 20.5 cents per mile in 1986, the Board found $7.50 to be a reasonable weekend trip allowance.

We add that what has not been forthcoming from the Carrier is a common sense justification for paying system maintenance crew employees (who must travel throughout the system) about one half as much as employees on the four sectional district crews. Clearly the Arbitration Board did not venture beyond the permissible ambit of Emergency Board 209.

### C. *Moratorium*

■ Finally, the Carrier complains that the award prohibits the serving of any notice of proposed changes in matters covered by the award and mandates the withdrawal of any proposals in "pending" notices relating to such matters, whether filed before or after May 16, 1986, the date of Executive Order 12557. The Carrier protests that the Emergency Board did not mention any such moratorium.

The Emergency Board, however, noted that both the Carrier and the Organization had served notices to change wages and work rules that were identical to those served on a national basis. It also, as we have indicated, recognized the Carrier's "willingness to provide for peaceful disposition of all other rules and working conditions on a local basis." The Emergency Board therefore issued its Recommendations 3 and 4:

3. Consistent with the parties' proposals of March 2 and 3, 1986, and in view of their past practice, the parties should agree to be bound by the results of the national negotiations involving rates of pay and health and welfare programs.

4. The parties should agree to handle changes in work rules and practices contained in notices which had been served prior to Executive Order 12557 under the orderly and peaceful procedures of the Railway Labor Act, as amended, up to and including mediation, and without resort to self-help.

The Arbitration Board's reasoning for imposing a moratorium was as follows:

Emergency Board 209 was convinced that all issues which related to changes in rates of pay and health and welfare programs should, as they had in the past, be reserved for resolution on the basis of the results of national handling. True, the moratorium issue itself was not specifically addressed in EB 209's four (4) recommendations. It appears clear that EB 209 had envisioned a reasonable and realistic resolution of all outstanding dis-

putes between the parties on a basis of its recommendations and the result of national handling which, generally includes a moratorium. There was simply no need to address that matter directly as it was not in dispute. Nevertheless, the seasoned, knowledgeable, and qualified public members of Presidential Emergency Board 209 were well aware that the moratoriums had been part of national settlements for many, many years.

The absence of a moratorium provision would render moot the terms of recommendation No. 4 relative to the resolution of work rule issues under the peaceful procedures of the Railway Labor Act. In addition, such an application of the Board's Report would indicate an intent to not put all outstanding disputes to rest.

Apart from the intrinsic sense of this reasoning, we have been unable to discern how the Carrier is meaningfully disadvantaged by the moratorium provisions. As for filing new notices of desired changes, the April 1, 1988, deadline is long past and the Carrier is free to file at any time. The Carrier concedes this point but claims prejudice in being forced to withdraw "[c]ertain proposals in [the] May 24 notices, including some concerning work rules and practices, [that] come within the scope of the broad moratorium provision in the arbitration award." We are not told what these proposals call for. We are referred only to the covering letter of May 24, 1986, from the Carrier to BMWE which states, "[W]e have taken the liberty of drafting an entirely new agreement rather than attempting to describe and catalogue changes to existing agreements." In light of the obvious fact that the Carrier's May 24 notice was seeking a major change in the ground rules of the industry, we are unwilling to assume on the basis of what has been presented to us that any specific withdrawals mandated by the Arbitration Award have any significant effect on the Carrier.

Moreover, we also note that the Carrier has transferred its operations to the Springfield Terminal Railway Company under leases that it has so far successfully

claimed are exempt from regulation by the Interstate Commerce Commission. BMWE is contesting this. It is obvious that the final disposition of this issue is in the more distant future. The mere assertion by the Carrier that the task required by the moratorium of refiling any of the May 24 proposals may take some time carries little weight under these circumstances. Indeed, when we realize that the Carrier would have us declare the entire award nugatory because of its wholly speculative and attenuated argument on this issue, we appreciate the wisdom of Section 9 Third: "[N]o award shall be set aside for trivial irregularity ..., going only to form and not to substance." 45 U.S.C. § 159 Third (c).

*Affirmed.*

TORRUELLA, Circuit Judge (concurring).

Although I concur in the outcome of this case I am not as certain as my brethren that the standards of judicial review for contractual arbitration, *ante* at 428, are necessarily the same as those prevalent in the case of legislatively-imposed substantive arbitration, such as in the present appeal. Because of my concurrence in this case's outcome, I find it unnecessary at this time to define the precise boundaries of what I perceive to be very different kinds of arbitrations thus requiring different standards of judicial review. I venture to advance, however, that absent other factors, in my view the standard of judicial review of legislatively-mandated arbitration is more akin to that involving statutory interpretation and is thus broader in scope than run-of-the-mill contractual arbitration wherein the parties have agreed to the private, non-appealable finality of the award. However, I shall leave this debate to a more appropriate occasion.