**SPRINGFIELD TERMINAL RAILWAY CO., Plaintiff,**

v.

**UNITED TRANSPORTATION UNION, Defendant.**

**Civ. No. 88–0117–P.**

United States District Court, D. Maine.

June 26, 1991.

Charles S. Einsiedler, Jr., Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, Me., for plaintiff.

Michael Davidson, Senate Legal Counsel, Washington, D.C., for Sen. Kerry, etc.

Herbert E. Forrest, Federal Programs Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for National Mediation Bd.

Clinton J. Miller, III, Asst. General Counsel, Cleveland, Ohio, Craig J. Rancourt, Biddeford, Me., for defendant.

GENE CARTER, Chief Judge.

### MEMORANDUM AND ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

This case deals with a work stoppage begun by the United Transportation Union (UTU) against Springfield Terminal (ST) in November 1987. Invoking the protection of the Federal Railroad Safety Act (FRSA), 45 U.S.C. § 441, the UTU asserts that the work stoppage was prompted by hazardous conditions existing on ST's railroads. ST maintains that the withdrawal from service concerns work issues other than safety. In Civ. No. 87–342, a companion case arising from the same work stoppage, the UTU sought declaratory and injunctive relief after ST established a policy that employees involved in the work stoppage had resigned. This Court denied UTU's motion for a preliminary injunction, noting that resolution of the issues presented by the UTU was entirely dependent on factfinding statutorily committed to an arbitral tribunal. *United Transportation Union v. Springfield Terminal Co.*, 675 F.Supp. 683 (D.Me.1987).

Shortly after the Court's decision, Public Law Board 4462 (Procedural) was established. That Board issued an award in April 1988, finding that a merits board should determine the propriety of the actions of ST and the UTU surrounding the work stoppage. ST filed Civ. No. 88–117 P to set aside the award. Public Law Board 4462 (Merits) issued its decision in June 1988, finding that the work stoppage was permissible under Section 10 of the FRSA and that ST's policy of treating striking employees as having resigned was imper-

missible discrimination. The award ordered the return to work of the employees with seniority rights unimpaired and back pay for the period of the work stoppage. Subsequent awards specifically detailed the back pay remedy.

ST sought a temporary restraining order and preliminary injunction to have Dr. Francis Quinn, the neutral arbitrator, removed from Public Law Board 4462 (Merits). That motion was denied by this Court after hearing on July 13, 1988. After Public Law Board 4462 issued its award on back pay in the fall of 1988, ST filed its third supplemental petition [1] seeking to set aside all the awards of the Board. The UTU filed a counterclaim seeking enforcement of the awards. Now before the Court are cross-motions for summary judgment.

A motion for summary judgment must be granted if:

> [T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). The Court of Appeals for the First Circuit has aptly articulated the legal standard to be applied in deciding motions for summary judgment:

> [T]he movant must adumbrate 'an absence of evidence to support the nonmoving party's case.' *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 [106 S.Ct. 2548, 2554, 91 L.Ed.2d 265] (1986). When that is accomplished, the burden shifts to the opponent to establish the existence of a fact issue which is both 'material,' in that it might affect the outcome of the litigation, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 [106 S.Ct. 2505, 2510, 91 L.Ed.2d 202] (1986); *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904 [96 S.Ct. 1495, 47 L.Ed.2d 754] (1976), and 'genuine,' in that a reasonable jury could, on the basis of the proffered proof, return a verdict for the opponent. *Anderson*, 477 U.S. at 248 [106 S.Ct. at 2510]; *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir.1988). It is settled that the nonmovant may not rest upon mere allegations, but must adduce specific, provable facts demonstrating that there is a triable issue. 'The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial.' *Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989). As the Supreme Court has said:

> [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Anderson*, 477 U.S. at 249–59 [106 S.Ct. at 2510–16].

*Brennan v. Hendrigan*, 888 F.2d 189, 191–92 (1st Cir.1989).

### Standard of Review

Section 3, First of the Railway Labor Act, 45 U.S.C. § 153, First (g), as incorporated by the FRSA, 45 U.S.C. § 441(c)(1), provides specific, very limited grounds for the review of arbitration awards. An award may be set aside "for failure of the [arbitration board] to comply with the requirements of this Act, for failure of the order to conform, or confine itself, to matters within the scope of the [board's] jurisdiction, or for fraud or corruption by a member of the [board] making the order." 45 U.S.C. § 153, First (q). As has often been reiterated, "[j]udicial review of an arbitration award is among the narrowest known in the law." *Maine Central R.R. v. Brotherhood of Maintenance of Way Em-*

---

1. In June 1988 ST had filed a first supplemental petition for review of the merits award, which also added the National Mediation Board (NMB) as a Defendant. The NMB's motion to dismiss was granted in May 1989.

*ployees,* 873 F.2d 425, 428 (1st Cir.1989).[2] This Court has previously stated, however, that the narrowness of the review does not deprive the Court of the power to review awards for violations of due process. *Springfield Terminal R.R. Co. v. United Transportation Union,* 711 F.Supp. 665, 666 n. 2 (D.Me.1989); *Maine Central R.R. v. Brotherhood of Maintenance of Way Employes,* 691 F.Supp. 509, 510 (D.Me. 1988).

▓▓▓ The Court of Appeals has routinely looked to non-rail arbitration cases for an articulation of the method to be used in applying the standard of review in rail labor cases. *See Maine Central R.R. v. Brotherhood of Maintenance of Way Employees,* 873 F.2d at 428 (citing *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987), a non-rail case, as the "beacon" guiding judicial review in a rail case). Thus, this Court finds helpful in its current endeavor the Court of Appeals' recent description of the review process in the realm of contractual arbitration:

> We do not sit as a court of appeal to hear claims of factual or legal error by an arbitrator or to consider the merits of the award. We cannot vacate the award because the arbitrator misreads the contract, where there is room to do so, nor are we authorized to reject his honest judgment as to the appropriate remedy, if the contract gives him authority to decide that question. 'As long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.'

*Challenger Caribbean Corp. v. Union General de Trabajadores,* 903 F.2d 857, 860–61 (1st Cir.1990) (*quoting Georgia–Pacific Corp. v. Local 27, United Paperworkers Int'l Union,* 864 F.2d 940, 944 (1st Cir.1988) and *Misco,* 484 U.S. at 38, 108 S.Ct. at 370).

▓▓▓ Although the prescribed review is highly deferential, the Supreme Court made clear in *Misco,* 484 U.S. at 38, 108 S.Ct. at 371 (1987), that "an arbitrator's award settling a dispute with respect to the interpretation and application of a labor agreement must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice." In a case like this one, where the dispute involves interpretation and application of the statute mandating the arbitration, it is plain that the award must draw its essence from the statute; *i.e.,* the arbitrator must, at the very least, have arguably construed or applied the statute. *See, id.*

Initially, ST argues that an arbitration board's determination of its own jurisdiction is not entitled to the usual deference on review, but rather that Court should examine the jurisdiction question *de novo.* ST cites *AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 651, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986) and *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 583 n. 7, 80 S.Ct. 1347, 1353 n. 7, 4 L.Ed.2d 1409 (1960) for the general proposition that the question of arbitrability is to be decided by a court, not by the arbitrator. The Court, of course, does not disagree with this general principle.

ST, however, neglects to mention the condition on the general rule imposed by both of these decisions. As the Court put it in *AT & T:* "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court." *AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. at 649, 106 S.Ct. at 1418. The reason for the general rule is that arbitration is generally a matter of contract. Therefore, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers v. Warrior &*

---

**2.** In *Maine Central Railroad,* the court was discussing review under 45 U.S.C. § 159 Third (b) rather than under 45 U.S.C. § 153 (First) (q). This Court has previously explained that Congress intended to make the scope of review in section 153 identical to that provided in section 159. *Maine Central R.R. v. Brotherhood of Maintenance of Way Employes,* 663 F.Supp. 425, 428 (D.Me.1987).

*Gulf Navigation Co.,* 363 U.S. at 582, 80 S.Ct. at 1353. Because of this link to the contractual nature of arbitration, "the judicial inquiry ... must be strictly confined to whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made." *Id.*

■ In this case arbitration is the explicit choice of Congress, not the result of an agreement between the parties. Congress gave the arbitrator the power to make the award and made plain that *"[a]ny dispute, grievance, or claim arising under this section shall be subject to resolution in accordance with the procedures set forth in section 3 of the Railway Labor Act (45 U.S.C. § 153)."* 45 U.S.C. § 441(c)(1) (emphasis added). As the Supreme Court made clear in the contractual context: "The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract." *United Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 567–68, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960) (*quoted in Strathmore Paper Co. v. United Paperworkers International Union, AFL–CIO,* 900 F.2d 423, 425 (1st Cir.1990)). In the context of the FRSA, where Congress has decided to submit all disputes arising under the statute to the arbitrator, even if the Court's function is to review *de novo* a determination of jurisdiction, *see Local 900, United Paperworkers Int'l Union v. Boise Cascade Corp.,* 664 F.Supp. 34, 36 (D.Me. 1987), the review is limited to inquiring whether the party seeking the arbitration is making a claim which on its face is governed by the FRSA.

ST also argues that review of FRSA arbitration awards need not be as limited as review of awards under the RLA because arbitration under the FRSA is not contractually agreed upon, but rather is statutorily mandated. In a concurring opinion in *Maine Central R.R. v. Brotherhood of Maintenance of Way Employees,* 873 F.2d at 431, Judge Torruella stated: "I am not as certain as my brethren that the standards of judicial review for contractual arbitration ... are necessarily the same as those prevalent in the case of legislatively-imposed substantive arbitration, such as in the present appeal." In the majority opinion in that case, however, Judge Coffin clearly set forth the standard of review to be applied, and it is that standard which the Court has now adopted.

ST also urges a broader standard of review for arbitral interpretations of federal statutes. The Court finds both the principle and the precedent relied upon by ST unacceptable. In the primary case cited by ST, *Gonzalez v. Southern Pacific Transportation Co.,* 773 F.2d 637, 644 (5th Cir. 1985), the court held that "the general rule that railway labor disputes are subject only to arbitration and limited judicial review must yield when employees assert rights guaranteed by a federal statute." The Supreme Court has held that prior arbitration of contractual claims does not bar subsequent judicial resolution of statutory claims. *See, Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *Barrentine v. Arkansas–Best Freight System, Inc.,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981); *McDonald v. City of West Branch,* 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984). The *Gonzalez* holding, however, sweeps much too broadly. *See, Gilmer v. Interstate/Johnson Lane Corp.,* —— U.S. ——, ——, —— n. 5, 111 S.Ct. 1647, 1654, 1656 n. 5, 114 L.Ed.2d 26 (1991) (holding that a party can be compelled to arbitrate statutory age discrimination claims covered by an arbitration agreement). ST offers the reasoning of *Gonzalez* and its predicate Supreme Court cases as support for its argument that judicial review of arbitrators' decisions on statutory construction must be broader than it is for factual issues:

> Arbitration is not an equivalent substitute [for judicial determination]. The arbitrator's experience relates to the "law of the shop, not the law of the land" and he may not have the requisite expertise for legal analysis and statutory construction. The arbitrator's authority is limit-

ed to the collective bargaining agreement, and he may not look outside the agreement to enforce statutory rights. When the terms of the agreement conflict with rights under a federal statute, the arbitrator has no choice but to enforce the agreement and ignore the statute. Were he independently to take cognizance of the statute, that would be adequate grounds to deny enforcement of his decision.

*Gonzalez v. Southern Pacific Transportation Co.,* 773 F.2d at 643.

This reasoning embodies what the Supreme Court has called "'the old judicial hostility to arbitration,'" *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 480, 109 S.Ct. 1917, 1919, 104 L.Ed.2d 526 (1989) (quoting *Kulukundis Shipping Co. v. Amtorg Trading Corp.,* 126 F.2d 978, 985 (2d Cir.1942) (Frank, J.)), and the Court recently has repeatedly repudiated it. *Gilmer v. Interstate/Johnson Lane Corp.,* — U.S. at —, — n. 5, 111 S.Ct. at 1654, 1656 n. 5; *Rodriguez de Quijas v. Shearson/American Express,* 490 U.S. at 485, 109 S.Ct. at 1922 (*overruling Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), the principal case in which the anti-arbitration sentiment was articulated);[3] *Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 231, 107 S.Ct. 2332, 2340, 96 L.Ed.2d 185 (1987); *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,*

473 U.S. 614, 628–38, 105 S.Ct. 3346, 3354–60, 87 L.Ed.2d 444 (1985).[4] As the Court stated in *McMahon,* 482 U.S. at 232, 107 S.Ct. at 2340 (citations omitted):

> Indeed, most of the reasons given in Wilko have been rejected subsequently by the Court as a basis for holding claims to be nonarbitrable. In Mitsubishi, for example, we recognized that arbitral tribunals are readily capable of handling the factual and legal complexities of antitrust claims, notwithstanding the absence of judicial instruction and supervision.... Likewise, we have concluded that the streamlined procedures of arbitration do not entail any consequential restriction on substantive rights. Finally, we have indicated that there is no reason to assume at the outset that arbitrators will not follow the law; although judicial scrutiny of arbitration awards necessarily is limited, such review is sufficient to ensure that arbitrators comply with the requirements of the statute.

Most recently, in *Gilmer* the Supreme Court again made very clear that it has rejected the view expressed in the *Gardner–Denver* line of cases cited by ST "that arbitration was inferior to the judicial process for resolving statutory claims." *Gilmer v. Interstate/Johnson Lane Corp.,* — U.S. at — n. 5, 111 S.Ct. at 1656 n. 5.

Arbitration is particularly not inferior to the judicial process in a case like this one. First, Congress obviously did not intend for

---

**3.** Twice in the context of arbitration in which statutory rights were at issue, the Supreme Court has harked back not to *Wilko's* criticism of the arbitration system, but to Justice Frankfurter's dissent in that case in which he said: "There is nothing in the record before us, nor in the facts of which we can take judicial notice, to indicate that the arbitral system ... would not afford the plaintiff the rights to which he is entitled." *Wilko v. Swan,* 346 U.S. at 439, 74 S.Ct. at 189, (*quoted in, Rodriguez de Quijas v. Shearson/American Express,* 490 U.S. at 483, 109 S.Ct. at 1921 and *Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 231, 107 S.Ct. 2332, 2340, 96 L.Ed.2d 185 (1987)).

**4.** ST's failure to cite these cases (the very recent *Gilmer* case excluded, of course) in its argument on this point constitutes a distressing lack of professionalism, perilously close to the point of counsel's misrepresentation of the current state

of the case law. In proffering the Fifth Circuit's 1985 decision in *Gonzalez* as persuasive precedent on the scope of review regarding arbitral interpretations of federal statutes, ST stated: "Although there is case law arguably to the contrary, the better-reasoned decisions reviewing arbitral constructions of federal law follow the rule that the federal court may and must examine the arbitrator's ruling regarding *federal law de novo.*" This is a disingenuous conclusion. Supreme Court precedent to the contrary should have been cited, particularly in a 240 page brief that purports to be comprehensive.

The Court notes that the UTU also failed to point out these cases in response to ST's *Gonzalez* argument. Because of this, had the Court relied as fully as it was entitled to do upon the integrity of ST's description of the existing state of the pertinent case law and the thoroughness of UTU's research effort, it would likely have been led into grievous error!

the rights created by the FRSA to be judicially enforced except as that may be the end result of the section 3 arbitration process. 45 U.S.C. § 441(c)(1); H.R.Rep. No. 96–1025, 1980 U.S.Code Cong. & Admin. News 3830 at 3841. Moreover, the safety issues that are the concern of the FRSA fall precisely within the arbitration board's range of expertise. As the Supreme Court has recently explained: "The issue of safety in the workplace is a commonplace issue for arbitrators to consider in discharge cases." *United Paperworkers v. Misco,* 484 U.S. at 45 n. 11, 108 S.Ct. at 374 n. 11.

■ The same limited review applies to the arbitration board's decisions on federal statutory issues under the FRSA as applies to its factfinding. *See Gilmer v. Interstate/Johnson Lane Corp.,* — U.S. at — n. 4, 111 S.Ct. at 1655 n. 4; *Shearson/American Express, Inc. v. McMahon,* 482 U.S. at 232, 107 S.Ct. at 2340. The Supreme Court has made that clear in the context of railroad arbitration as well:

> Characterizing the issue presented as one of law, as the Court of Appeals seemed to do here, does not alter the availability or scope of judicial review: The dispositive question is whether the party's objections to the Adjustment Board's decision fall within any of the three limited categories of review provided for in the Railway Labor Act. Section 153, First (q) unequivocally states that the 'findings and order of the [Board] shall be conclusive on the parties' and may be set aside only for the three reasons specified therein. We have time and again emphasized that this statutory language means just what it says.

*Union Pacific R.R. v. Sheehan,* 439 U.S. 89, 93, 99 S.Ct. 399, 402, 58 L.Ed.2d 354 (1978).

### Count I

■ In Count I, ST seeks to set aside the procedural award on the grounds that the arbitrator erroneously ruled that Section 3 First (i) of the RLA does not apply to disputes arising under the FRSA. Section 153 First (i) provides:

> The disputes between [a] ... group of employees and a carrier ... growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions ... shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes.

45 U.S.C. § 153 First (i). In this case the arbitrator found that the carrier had presented convincing evidence that the dispute had not been handled on the property in the usual manner before resort to arbitration. Procedural Award, at 6. He also determined that requiring compliance with the on-property handling provisions of section 3 would undermine the FRSA's statutory purpose:

> To the extent that the dispute here concerns the existence of 'a hazardous condition,' FRSA Section 10 states the necessary pre-conditions to a protected work stoppage (i.e., Section 10(b)(1)(C) providing for "notification"). To suggest that withholding of services under an alleged hazardous condition must await completion of the various time periods of the grievance procedure would defeat the rights provided to employees under Section 10.
>
> To the extent that the dispute is concerned with alleged 'discharge' or 'discrimination' by the Carrier following the stoppage, there may have been the opportunity for the usual on-property claims handling. This, however, is necessarily intertwined with findings as to the work stoppage itself, which as stated above, was permissible if it is determined that FRSA Section 10 conditions were met.

*Id.* at 6–7.

Citing over three pages of arbitration awards in a wearisome display of legal

overkill, ST argues that the Public Law Board lacked jurisdiction to hear the dispute presented to it because the UTU had not followed the usual procedures for on-property claims handling. The Court disagrees.

■ In essence the arbitrator decided that in the context of an FRSA arbitration, the parties did not have to meet all the procedural requirements of section 3.[5] In a case of arbitration mandated under the terms of a collective bargaining agreement, the Supreme Court has stated that questions concerning the procedural prerequisites to arbitration must be decided by the arbitrator rather than the court.

Doubt whether grievance procedures or some part of them apply to a particular dispute, whether such procedures have been followed or excused, or whether the unexcused failure to follow them avoids the duty to arbitrate cannot ordinarily be answered without consideration of the merits of the dispute which is presented for arbitration.... It would be a curious rule which required that intertwined issues of "substance" and "procedure" growing out of a single dispute and raising the same questions on the same facts had to be carved up between two different forums, one deciding after the other.... Once it is determined ... that the parties are obligated to submit the subject matter of a dispute to arbitration, "procedural" questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator.

*John Wiley & Sons v. Livingston,* 376 U.S. 543, 557, 84 S.Ct. 909, 918, 11 L.Ed.2d 898 (1964). In the context of a statutorily-mandated arbitration, where a statute, rather than a contract provides the procedures to be followed, the same reasoning dictates that the arbitrator should make similar determinations—not just about compliance with procedural prerequisites to arbitration, but also about the applicability of the procedural prerequisites set forth in the statute.

ST argues that the Board totally ignored the requirements of the RLA and the FRSA by failing to require the on-property dispute handling mechanisms. Just as the arbitration tribunal in a contractual dispute may not ignore the plain language of the contract, *Misco,* 484 U.S. at 38, 108 S.Ct. at 370, the Board in a case like this one may not ignore the plain language of the governing statutes. The Board here, however, did not ignore the statutes. Instead it examined the FRSA, which had incorporated the RLA, to determine how the two governing statutes best fit together to effectuate the purposes of the FRSA. In *Challenger Caribbean Corp.,* 903 F.2d at 868–869, in the context of a contractual arbitration, the Court of Appeals affirmed an arbitrator's remedy decision that deviated from the governing stipulation when the arbitrator made "plausibl[e]" determinations to support his finding that "the remedy limitations contained in the Stipulation were inapplicable" in the situation presented by that case.

In a case cited by ST, *Engel v. Davenport,* 271 U.S. 33, 38, 46 S.Ct. 410, 412, 70 L.Ed. 813 (1926), the Supreme Court explained that "adoption of an earlier statute by reference makes it as much a part [of the adopting statute] as if incorporated at full length." Although ST relies on this language to argue that there can be no deviation from the procedures set forth in section 3 of the RLA, which was incorporated by the FRSA, the Supreme Court in

---

5. The Court notes that the procedural award's decision not to include the on-property handling of disputes as a jurisdictional prerequisite to arbitration parallels the decision of the First Circuit Court of Appeals in *Boston & Maine Corp. v. Lenfest,* 799 F.2d 795, 802 (1st Cir.1986), one of the few cases addressing the FRSA. In that case the District Court made no specific finding concerning handling of the asserted safety dispute on the property, but found that the union had not reported specific instances of the carrier's failure to provide flagging. The court held that the FRSA did not apply. The Court of Appeals could not and did not make a finding addressing the on-property dispute handling requirements of section 3 in the context of that case. It did, however, reverse the determination that the FRSA did not apply and referred the dispute directly to the *National Railroad Adjustment Board,* "pursuant to § 3 of the RLA, 45 U.S.C. § 153." *Lenfest,* 799 F.2d at 802.

*Engel* went on to explain that the reference "brings into the later act all that is fairly covered by the reference—that is to say all the provisions of the former act which, from the nature of the subject matter, are applicable to the later act." *Id.* The arbitrator is charged with making the determination of how much is "fairly covered by the reference." He did so in this case to effectuate the purposes of the FRSA.

As this Court has previously explained, a party may, as ST did, raise before the arbitrator its claim that a "grievance is procedurally non-arbitrable, *i.e.*, that the contractual procedures for taking a grievance to arbitration have not been followed." *Local 900 v. Boise Cascade*, 664 F.Supp. at 36. The arbitrator's decision is subject to the "very limited judicial review announced in *United Steelworkers v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 596–97 [80 S.Ct. 1358, 1360–61, 4 L.Ed.2d 1424] (1960)." *Id.* In *Enterprise Wheel*, the Court held that an arbitration award is legitimate only so long as it draws its essence from the collective bargaining agreement. *United Steelworkers v. Enterprise Wheel and Car Corp.*, 363 U.S. at 597, 80 S.Ct. at 1361. Here the procedural award plainly draws its essence from the FRSA and its underlying purpose. Since the award is not "wholly baseless and completely without reason," *see Gunther v. San Diego & Arizona Eastern Ry. Co.*, 382 U.S. 257, 261, 86 S.Ct. 368, 371, 15 L.Ed.2d 308 (1965), it is not the function of this Court to upset the findings and order.[6] Summary judgment for the UTU is appropriate, therefore, on Count I.

### Counts II and III

 ST argues that safety was merely a pretext for the work stoppage conducted by the UTU and that the Court rather than

the arbitration board was the appropriate body to decide the issue. In Count II ST alleges that the procedural board's decision was ambiguous on this point and the case should be remanded. In Count III ST asserts that if the procedural board did decide to refer the pretext question to the merits board, the award must be set aside because the issue was one for the Court.

The pretext question is plainly a factual determination, requiring consideration of evidence about the existence of a hazard and the motives of the strikers.[7] ST argues that according to the First Circuit's opinion in *Lenfest*, 799 F.2d at 798, the issue of whether safety was a mere pretext for an illegal strike must be decided by a federal court before any disputes about the work stoppage are sent to arbitration. Although some of the language used by the court in *Lenfest* provides superficial support for ST's argument, a careful reading of the decision and the decision of the court below, shows that the question of pretext posited by ST requires factfinding which must be left to the arbitration board.

In *Lenfest* the United Transportation Union engaged in a concerted work stoppage allegedly because the carrier refused to provide adequate flagging signals along the railroad tracks of the Plaintiff B & M Railroad. The B & M contended that the work stoppage constituted an illegal strike because the union had failed to use the dispute resolution procedure for minor disputes set forth in section 3 of the RLA. The District Court, agreeing with the B & M, determined that the dispute was a minor dispute under the RLA and that the FRSA did not apply. *Boston and Maine Corp. v. Lenfest*, 622 F.Supp. 942, 946 (D.Mass. 1985).

---

**6.** This represents application of the very narrow standard of review under the RLA. Although ST argues strenuously that the procedural award must be overturned because it does not strictly comply with the requirements of the RLA, that statutory ground for review begs the question here, where one issue before the arbitrator was whether under the FRSA all or part of the section 3 of the RLA has been incorporated and is applicable.

**7.** Both the Supreme Court and the Court of Appeals for the First Circuit have treated pretext questions, which arise often in the context of discrimination cases, as fact questions to be determined by the court on the basis of an evidentiary showing. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 258, 101 S.Ct. 1089, 1093, 1095, 67 L.Ed.2d 207 (1981); *Lamphere v. Brown University*, 798 F.2d 532, 543 (1st Cir.1986).

The Court of Appeals disagreed with the District Court, holding that the FRSA did apply. The court characterized the question it was answering in terms that could be construed as permitting a factual inquiry and determination by the court: "The first issue is whether this was really a refusal to work under hazardous conditions." *Lenfest*, 799 F.2d at 798. When the explanatory language is parsed, however, it is clear the Court was reviewing the threshold legal determination whether the dispute arose under the FRSA. As mentioned above, the issue raised in the District Court had been just that.

The Court of Appeals found that the district court had made no explicit or implicit finding that the reason for the work stoppage was not a hazardous condition. Certainly, if a *factual* finding had been required on the issue, the Court of Appeals would not have made it but would have remanded the case to the District Court where factual determinations are properly made. The Court of Appeals based its decision that the FRSA did apply on the allegations and arguments of the parties, and the fact that the district court expressly treated the work stoppage as a safety strike, by "referring to 'the dispute over the B & M's *alleged* failure to provide flagging in this case' and to 'a legal right to safe working conditions'" and by citing a case involving a concerted refusal to work under hazardous conditions. *Id.* (Emphasis added.) Although the Court of Appeals did not use the term, it was basically addressing the question of substantive arbitrability. As discussed previously, where Congress has decided that all disputes or grievances arising under the FRSA will be arbitrated, the Court's function is very limited. It must determine whether the dispute or grievance arises under the FRSA, *i.e.* whether the party seeking the arbitration is making a claim which on its face is governed by the FRSA. *See, United Steelworkers v. American Mfg. Co.*, 363 U.S. at 567–68, 80 S.Ct. at 1346–47; *Maritime Service Corp. v. Sweet*

*Brokerage De Puerto Rico, Inc.*, 537 F.2d 560, 562 (1st Cir.1976) (for an action to arise under a federal statute, it is sufficient that the statute "creates the cause of action."). Such a determination is akin to that made by a District Court on a Rule 12(b)(6) motion to dismiss for failure to state a claim. It is not a factual determination.[8]

The Court is persuaded for another reason that the Court of Appeals did not intend for the District Court, at the outset of an alleged FRSA case, to engage in the factual inquiry necessary to decide whether the allegations of safety hazards are merely a pretext for the work stoppage. As the Court of Appeals made very plain later in *Lenfest*, factfinding in the context of the FRSA is for the arbitration board:

> Section 10(c) of the FRSA states plainly that *"[a]ny* dispute, grievance, or claim arising under this section *shall be* subject to resolution in accordance with the procedures set forth in section 153 of this title." 45 U.S.C. § 441(c) (emphasis added). It does not state "any valid dispute," or "any dispute for which the conditions of this section are met." Section 3 (45 U.S.C. § 153) provides for the settlement of railroad labor disputes by the National Railroad Adjustment Board. The House Report that accompanied the FRSA is clear, "[t]he Committee intends this to be the exclusive means for enforcing this section." H.R.Rep. No. 1025, 1980 U.S.Code Cong. & Ad.News at 3841. If the applicability of Section 10 of the FRSA depended on the findings of fact made by a district, this would render the § 10(c) requirement meaningless. The Board would have to follow the district court's findings of fact and could do nothing but determine a remedy. Such a bifurcated resolution of disputes over hazardous working conditions would vitiate a provision designed to provide speedy and final nonjudicial resolution.

*Lenfest*, 799 F.2d at 800 (emphasis in original). The pretext question which ST seeks

---

8. The Court notes that some confusion may have been generated by *Lenfest* because of the posture of that case. An injunction had been

sought, and the district court had held an evidentiary hearing on the injunction request, so factfinding had occurred.

to have the Court decide as an initial matter is basically the question whether this is a valid safety dispute. The Court finds, therefore, that the so-called pretext issue should not be addressed by the Court prior to arbitration.[9]

This case began in court initially, with the UTU seeking an injunction to be put back to work. This Court's opinion on the motion for preliminary injunctive relief demonstrates that the Court found, as had the court in *Lenfest*, that the dispute arose under the FRSA. *United Transportation Union v. Springfield Terminal*, 675 F.Supp. at 685. In accordance with the teaching of *Lenfest*, this Court left the factfinding concerning the validity of the dispute to the arbitration board. *Id.* The Court, therefore, answered the only threshold question which it was required to answer under *Lenfest.* Since the central premise of Counts II and III—that the issue of pretext must be decided by the court prior to arbitration—is mistaken, summary judgment is appropriate for the UTU on those counts.[10]

ST also argues that since neither the procedural nor the merits arbitration board decided whether "safety concerns (even if real) nevertheless served as a pretext for a strike to coerce the UTU's seniority and union shop demands," there has been no determination as to whether the FRSA applies and the arbitration award must be set aside. The Court cannot tell to which Count of the complaint this argument relates. Counts II and III deal with pretext but do not allege the predicate for this argument. The Court finds the argument unpersuasive in any event.

The procedural board submitted the following questions for resolution by the merits board:

1. Did the refusal to work by certain of the Carrier's employees commencing November 12, 1987 meet the conditions set forth in FRSA Section 10(b)?

2. If question (1) is answered in the affirmative, what is the appropriate remedy, if any, under Section 10(c) for such employees?

ST argues that the procedural board, therefore, decided against considering the pretext issue and that the merits board, with the issues so framed for it also neglected to decide it.

For a work stoppage to be valid under the FRSA, it is plain that, in addition to other conditions, there must exist a hazardous condition of a statutorily specified nature and that the employee or employees can only refuse to work in good faith, when there is no reasonable alternative to such refusal. *See* 45 U.S.C. § 441(b)(1). These elements largely address ST's concern that employees might use safety as a pretext for applying economic pressure to the carrier. Therefore, the Court finds that the factors the arbitration board must consider under section 10(b) encompass what the Court understands as the pretext argument.

Clearly, however, employees are entitled to the protection of the FRSA if they meet the requirements of the statute. To the extent that ST's pretext argument suggests that there might be instances in which the requirements of the statute are met but the employees are still not entitled to the protection of the statute because of impure motives, the argument is wrong. Such a reading would undermine the dual

---

9. ST has cited two other district court opinions in which the courts, relying on *Lenfest,* engaged in factfinding to determine whether hazardous conditions existed and whether the employees' refusal to report to work was made in good faith. *See, Metro–North Commuter Rail Co. v. Teamsters,* 1988 WL 103359, 1988 U.S. Dist. Lexis 10648 (S.D.N.Y.1988) and *Monongahela Railway Co. v. Transportation Communications Union,* 132 L.R.R.M. 2180, 1989 WL 121170 (W.D. Pa.1989). To the extent that these courts read *Lenfest* as requiring a threshold factual determination about the existence of a safety hazard,

this Court disagrees. The Court notes, too, that in both of these cases evidentiary hearings were held on whether an injunction should issue to stop an ongoing strike.

10. Because the Court had an opportunity to decide that this was a case arising under the FRSA, the Court does not address the question as a review of a decision of substantive arbitrability made initially by the arbitration board. *See, Local 900,* 664 F.Supp. at 36.

purposes of the statute—to protect employees who report safety violations, and more broadly, to promote safety in all areas of railroad operations and to reduce railroad related accidents. *See Lenfest,* 799 F.2d at 799; 45 U.S.C. § 421.

### Count IV

ST has proffered no argument as to its motion for summary judgment on Count IV. Its motion will, therefore, be denied as to that count. Count IV seeks the vacation of the procedural award on the grounds that the board improperly declined to find the UTU's grievance hypothetical and instead referred it to the merits board. The UTU argues that the decision passes muster under the appropriate standard of review and should be enforced. As discussed above with regard to the pretext argument, application of the statutory requirements will determine whether a dispute is hypothetical. As *Lenfest* makes clear, the validity of the dispute is to be decided in fact-finding arbitration. *See, Lenfest,* 799 F.2d at 800. Clearly, then, the procedural board's decision draws its essence from the FRSA. Summary judgment is, therefore, appropriate for the UTU on Count IV.

### Count V

■ The FRSA provides that [w]henever an employee of a railroad is afforded protection under this section and under any other provision of law in connection with the same allegedly unlawful act of an employer, if such employee seeks protection he must elect either to seek relief pursuant to this section or pursuant to such other provision of law. 45 U.S.C. § 441(d). In the initial complaint here, Civ. No. 87–342, the UTU sought relief under both the FRSA and the Railway Labor Act. Before the procedural board, ST argued that the UTU had waived its right to an RLA section 3 arbitration proceeding by bringing Civ. No. 87–342 in federal court, thus electing to seek relief under another provision of law. Count V alleges that the procedural award should be set aside because the arbitrator rejected

this claim, refusing to characterize the RLA as an "other provision of law."

The UTU memorandum in support of its request for preliminary injunctive relief in Civ. No. 87–342 makes plain that the union saw the case as one under the FRSA. The injunction was sought to protect the jurisdiction of the public law board that would ultimately decide the issues under the FRSA. *See* Memorandum In Support of Motion for Preliminary Injunction, at 5. To the extent that the UTU invoked the RLA, it was to maintain the status quo "which existed prior to the exercise of clearly stated rights under the FRSA." *Id.* at 6. In its decision denying the UTU's request for declaratory and preliminary injunctive relief, this Court, *sub silentio,* determined that UTU had elected to proceed under the FRSA. The Court made clear that it would not conduct a parallel proceeding which "would frustrate Congress's express intent that disputes arising under the FRSA be resolved by the National Railroad Adjustment Board." *United Transportation Union v. Springfield Terminal Co.,* 675 F.Supp. at 685. The Court also determined that no injunction concerning rates of pay was necessary because a suitable remedy was available to the union under the FRSA if the arbitration proceedings should be resolved in their favor. *Id.* at 685–86. As the procedural arbitration award correctly held, the UTU was entitled to an RLA section 3 proceeding to determine its rights under the FRSA, because it had elected to proceed under the FRSA. Since the award draws its essence from the FRSA, summary judgment for the UTU is appropriate on Count V.

### Count VI

■ In Count VI ST challenges the merits arbitration awards on the grounds that they do not comply with the requirements of the FRSA or the RLA, do not conform or confine themselves to matters within the scope of the Board's jurisdiction, are without foundation in reason and fact, contain manifest errors of law, and reflect the Chairman's personal brand of justice. The Board made a number of specific findings and concluded that "the refusal to

work by certain of the Carrier's employees commencing November 12, 1987 did meet the conditions set forth in FRSA Section 10(b)." ST argues that the Board's findings did not meet the specific requirements of section 10(b) (45 U.S.C. § 441(b)).

Careful examination of the Board's merits award demonstrates that the Board has made a most unusual "manifest error of law" requiring vacation of the award. Federal Railroad Safety Authorization Act Section 10(b)(1) provides:

> A common carrier by railroad engaged in interstate or foreign commerce may not discharge or in any manner discriminate against any employee for refusing to work when confronted by a hazardous condition related to the performance of the employee's duties, if—
>
> > (A) the refusal is made in good faith and no reasonable alternative to such refusal is available to the employee;
> >
> > (B) the hazardous condition is of such a nature that a reasonable person, under the circumstances then confronting the employee, would conclude that—
> >
> > > i) the condition presents an imminent danger of death or serious injury; and
> > >
> > > (ii) there is insufficient time, due to the urgency of the situation, to eliminate the danger through resort to regular statutory channels; and
> >
> > (C) the employee, where possible, has notified his employer of his apprehension of such hazardous condition and of his intention not to perform further work unless such condition is corrected immediately.

45 U.S.C. § 441(b)(1). This statute is correctly reproduced in United States Code Annotated. 45 U.S.C.A. § 441(b)(1). The statute is incorrectly reproduced in United States Code Service and in the Lexis Codes Library.[11] In the latter, subsections (i) and (ii) to subsection (b)(1)(B) have been misplaced so they appear directly under the introductory matter in subsection (b)(1). This has the effect of deleting the reasonable person standard for the required findings of imminent danger or death and of insufficient time to eliminate the danger through regular statutory channels. The misplacement of the subsections also wreaks havoc with the rest of subsection (b)(1), making it very difficult to understand. It could be read to impose the reasonable person standard on the determination of whether adequate notice has been provided, where no such perspective is required by the actual statute.

The arbitration board's decision makes plain that it was following the misprinted statute found in United States Code Service or alternatively in Lexis. In the course of making its factual findings, the board appeared to attempt to track the statute as set forth in U.S.C.S. It made findings, in the order of the requirements there presented, (1) that a hazard existed, (2) that the Organization found imminent danger of death, (3) that there was insufficient time to eliminate the dangers through resort to regular statutory channels; (4) that the refusal to work was made in good faith and no reasonable alternative to the refusal was available, and (5) that a reasonable person, under the circumstances then confronting the employees, would conclude that the union had notified the carrier of its

---

**11.** The mistaken U.S.C.S. version of section 441(b)(1) is as follows:

> A common carrier by railroad engaged in interstate or foreign commerce may not discharge or in any manner discriminate against any employee for refusing to work when confronted by a hazardous condition related to the performance of the employee's duties, if—
>
> > (i) the condition presents an imminent danger of death or serious injury; and
> >
> > (ii) there is insufficient time, due to the urgency of the situation, to eliminate the danger through resort to regular statutory channels; and

> (A) the refusal is made in good faith and no reasonable alternative to such refusal is available to the employee;
>
> (B) the hazardous condition is of such a nature that a reasonable person, under the circumstances then confronting the employee, would conclude that—
>
> (C) the employee, where possible, has notified his employer of his apprehension of such hazardous condition and of his intention not to perform further work unless such condition is corrected immediately.

45 U.S.C.S. § 441(b)(1).

apprehension of the danger and intended not to have the employees work unless the conditions were corrected immediately. Although the order of the findings strongly indicates that the board applied the wrong version of the statute, the phrasing of the last finding demonstrates it beyond serious doubt. The Board stated:

The Board is compelled to conclude from the records, exhibits and testimony that the hazardous conditions facing the employees were of such a nature that a reasonable person, under the circumstances then confronting the employees would conclude that—the Organization had notified the Carrier of the apprehension of the employees they represented of such hazardous conditions and, that the Organization intended not to have the employees they represented perform further work unless such conditions were corrected immediately.

Arbitration Award (merits), at 5. This finding tracks almost verbatim, to the inclusion of the dash, the language of subsections (b)(1)(ii)(B) and (C) as they are set forth in U.S.C.S. Just as the juxtaposition of those two subsections in the U.S.C.S. version of the statute appears to impose a reasonable person requirement for the finding concerning notice, where none appears in the actual statute, the Board's decision finds adequate notice based on a reasonable person standard.

The Court is fully satisfied that the arbitration board conducted its hearing and made its findings concerning whether section 10(b)'s requirements had been met using an incorrect version of the statute. The difference between the actual statutory language and that found in the version used by the board is significant, specifically

since the erroneous version shifted the standards to be applied in determining if the statute's requirements had been met. The Court, therefore, cannot say that the merits award draws its essence from the FRSA, *see Misco*, 484 U.S. at 38, 108 S.Ct. at 370; *Enterprise Wheel and Car Corp.*, 363 U.S. at 597, 80 S.Ct. at 1361, as is required for the award to be legitimate. Since the merits award determining compliance with the statute is the predicate for the back pay merits awards, all of the merits awards must be vacated.

### Count VII

■ Count VII seeks the vacation of the merits award on the grounds that ST was denied due process of law. Although Count VII seeks vacation only of the merits award, ST argues that both the procedural and merits arbitration awards should be overturned because of bias on the part of the neutral arbitrators. Having already determined that the merits award must be vacated, the Court will address ST's arguments only as they relate to the procedural award.[12]

ST complains that the procedural neutral, Herbert Marx, was biased because he received *ex parte* communications, predisposing him on the merits of the underlying controversy and directly interfering with scheduling. Procedural neutral Marx was appointed on February 22, 1988. ST asserts that Marx was influenced to place the case on an expedited schedule by *ex parte* communications from the NMB, the union, and Congressman Silvio Conte.[13]

The record before the Court on this motion for summary judgment shows that on February 25, 1988, Arbitrator Marx wrote to the parties proposing a March 9 hearing

---

**12.** The Court notes again that the argument in the brief does not correspond directly to the allegations in the complaint.

**13.** ST also asserts, based primarily on newspaper reports that arbitration would start on March 2 or 3, that the NMB had promised the union an expedited date certain for the procedural public law board hearing. The Court cannot reach the conclusion urged by ST on this record. However, the Court notes that the fact is immaterial. The arbitrator did not suggest these dates. Moreover, the arbitration clearly

did not occur on the dates allegedly promised, and as discussed *infra*, it occurred only after much discussion with the parties. There was, therefore, no compromise of the process or prejudice to ST from any promise that might have been made, and thus no reason for vacation of the procedural award. *See Springfield Terminal v. United Transportation Union*, 711 F.Supp. at 666; *Professional Air Traffic Controllers Organization [PATCO] v. Federal Labor Relations Authority*, 685 F.2d 547, 564–65 (D.C.Cir.1982)

date and asking that the parties "please confirm promptly as to their availability on this date." UTU Vice–President Lyden telephoned Marx on February 27. ST's representative had written to Marx prior to receiving the letter, proposing dates of March 31, April 5, 7, 8, or 12. On February 29, having heard about ST's letter, Lyden wrote to Arbitrator Marx urging him to go forward with the March 9th date because "the workforce is on a work-stoppage due to safety hazards and have been for over three and one-half months. There clearly is urgency to this arbitration." The letter showed that copies had been sent to the NMB. Marx spoke with someone from ST about the date and was told that the carrier could not be available on the 9th. Marx then sent a letter to both parties proposing an April 5th hearing date and asking Lyden to advise if this was satisfactory to him. On March 3, Arbitrator Marx telephoned Lyden. It is unclear whether he spoke to him. On March 4, Lyden called Marx, then several other phone calls ensued with Arbitrator Marx speaking to Lyden and ST two or three times each and making brief phone calls to the NMB and NMB's Staff Director for Grievances. Lyden urged Marx to hold the arbitration as early as possible, and was told that the earliest ST could participate was March 29 or 30. On March 7, Marx wrote to the parties saying: "As a result of telephone conversations with each of you on March 4, 1988, concerning which I had kept you both concurrently advised, this will confirm arrangements for a hearing by the Board on March 30, 1988."

Congressman Conte sent a letter to Arbitrator Marx on February 25, stating in pertinent part:

As you well know, the UTU has been on strike since November 23, 1987. The failure of Guilford and the UTU to quickly settle the dispute has seriously disrupted rail service in New England. I am quite concerned about the effect this is having on the region's economy, on the workers who are suffering considerable hardship, on the shippers who have had to seek costly alternative support, and on the safety and continued validity of the Guilford system.

I request that you, as the key mediator in this dispute, take every appropriate action to expedite the process to resolve this dispute. Mediation can take considerable time, and in this case time is an expensive luxury. The quicker you are able to address the procedural questions, the quicker the dispute will move towards resolution. I hope that you will consider the seriousness of the situation in setting a firm time table for your mediation.

I appreciate your consideration of my request, and I look forward to an expeditious and fair resolution.

Marx responded to Conte after the date for the arbitration had been set, thanking him for his letter. The letter stated, in pertinent part:

The parties now have agreed to the earliest feasible date for hearing in this matter, and it is my belief that such hearing will be completed in one day. The hearing will be held on March 30, 1988. Please be assured that an award will issue in the promptest possible time frame in order to resolve the specific matter placed before this Procedural Public Law Board.

Should you wish further information as this matter progresses, I shall be happy to be of whatever assistance is possible within my jurisdiction. Your close interest in this matter is fully recognized by me.

Copies of these letters were not sent to the parties.

Although ST complains generically of *ex parte* communications to Marx by the NMB, there is no direct evidence of such communications. Arbitrator Marx wrote to the NMB at the conclusion of the proceedings, saying in part: "Because of your special interest in this matter, this is to advise you that an award was signed today by the Board (with the Carrier dissenting)." He went on to summarize the award.

■ The Court has carefully considered ST's charges of bias. It agrees with the Court of Appeals that "*ex parte* communications shadow the impartiality, or at least

the appearance of impartiality, of any judicial proceeding. And ... such conduct may, in some circumstances, constitute a deprivation of due process of law." *Grieco v. Meachum,* 533 F.2d 713, 719 (1st Cir. 1976). The ultimate question in determining if a proceeding in which *ex parte* communications occurred must be vacated is whether the integrity of the process and the fairness of the result were irrevocably tainted by the communications. *PATCO v. Federal Labor Relations Authority,* 685 F.2d at 564–65 (discussing *ex parte* communications under the Administrative Procedure Act); *see, Grieco,* 533 F.2d at 719.

■ Although *ex parte* communications from Congressmen or anyone else attempting to influence a decisionmaker regarding a pending matter are improper and should be discouraged, *Power Authority v. F.E.R.C.,* 743 F.2d 93, 110 (2d Cir.1984); *PATCO v. Federal Labor Relations Authority,* 685 F.2d at 570, *ex parte* communications aimed at acceleration of a case or scheduling in general are viewed as less serious intrusions and require a stronger showing of prejudice before a proceeding or award may be voided. *See, Gulf Oil Corp. v. Federal Power Comm'n,* 563 F.2d 588, 610–611 (3rd Cir.1977); *PATCO v. Federal Labor Relations Authority,* 685 F.2d at 569 n. 46; *Shell Oil Co. v. Dept. of Energy,* 477 F.Supp. 413, 430–31 (D.Del.1979).

In this case the letter from Congressman Conte was obviously an attempt to accelerate the proceedings before the procedural neutral. While the letter was written by one concerned with the fate of the employees and the public in general, the Court rejects ST's characterization of it as suggesting a result on the merits. The letter does not, as ST argues, urge the neutral to treat the proceedings before him as a *pro forma* exercise. Rather it states the obvious—that the sooner the procedural neutral concludes his hearing, the sooner the dispute will be resolved. The Court notes that while ST did not know of the letter from Congressman Conte, it had full opportunity to rebut the plea for acceleration,

for it was the same plea being made by the UTU. Moreover, as will be discussed more fully below, the hearing was not accelerated in any significant sense.

The other *ex parte* communications of which ST complains are the phone calls between the UTU's Lyden and the neutral arbitrator. The record clearly shows that equally *ex parte* phone calls occurred between the neutral arbitrator and someone at Springfield Terminal. The deposition testimony, letters from Arbitrator Marx and the parties, and the general context of the communications indicate that they were about scheduling. ST would have the Court infer, from the length and number of the UTU's phone calls, that while purportedly about scheduling, they were unacceptable *ex parte* communications, necessarily dealing with the merits of the dispute. This is not a permissible inference. Obviously, people's discussions of the same topic vary. Moreover, the fact of a telephone connection does not mean that conversation was occurring during the period of the connection. People may have to be called from distant places to answer or callers may be placed on hold.[14]

The Court also declines to find in this case that the existence of the phone calls raises a genuine question of material fact about their content and their impact on the arbitrator's ultimate decision. The deposition testimony of ST's Daniel Kozak shows that in the railroad arbitration context, scheduling sometimes occurs by means of individual telephone calls with the parties. If purported scheduling phone calls between a party and the neutral arbitrator could, by their length or their timing, occasion a trial on their contents in the context of an action to enforce or vacate an award, the arbitrators might abandon this type of scheduling. This could undermine the speed and informality of the arbitration process, two of the primary attributes that have made it a favored method of dispute resolution. *See Lenfest,* 799 F.2d at 800.

Obviously, the Court is not suggesting that improper contacts with an arbitrator

---

**14.** The record shows that Lyden's phone had the call-waiting service, which can put incoming calls on hold while the recipient finishes a call in progress.

by telephone should be insulated from review. It is suggesting, however, that the evidentiary threshold requiring that such review occur must be higher than it is here. Here, the arbitrator stated in his letter to the parties that the March 30 hearing date was set "[a]s a result of telephone conversations with each of you on March 4, 1988, concerning which I had kept you both concurrently advised." In the general scheduling context, the mere existence of the phone calls does not raise the specter of bias. In *Withrow v. Larkin*, 421 U.S. 35, 55, 95 S.Ct. 1456, 1468, 43 L.Ed.2d 712 (1975) the Supreme Court found that there was not an unacceptable risk of bias when individuals who had been exposed to evidence about a case in investigative procedures later heard and decided the case on evidence presented in an adversary setting. The Court stated: "Of course, we should be alert to the possibilities of bias that may lurk in the way particular procedures actually work in practice.... Without a showing to the contrary, state administrators 'are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.'" *Id. (quoting United States v. Morgan*, 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941)). Arbitrator Marx was a neutral, rather than a partisan arbitrator, and his written communications to the parties indicate an appreciation and concern for fair procedures. Just as in *Withrow v. Larkin*, "no specific foundation has been presented" in this case "for suspecting that the Board had been prejudiced." *Id.*

ST argues about *ex parte* communications with Arbitrator Marx as follows:

> True to his *ex parte* commitments, Arbitrator Marx conducted the procedural public law board on the expedited schedule he imposed. On April 14, 1988, only five weeks after he announced the schedule, Arbitrator Marx entered his Award, finding in all respects in favor of the

Union. Marx got the message, and did as he was asked to return the strikers to work. The Union's strategy of expedited arbitration thus had the desired result: an arbitrator had ignored the flaws in its case under Section 10(b) of the Federal Railroad Safety Act, and the matter would go forward to a merits board.

ST had proposed March 31, 1988 as a hearing date to Arbitrator Marx *before* it had even heard from him concerning scheduling. Since the hearing was ultimately conducted on March 30, only one day earlier than ST's proposed date, and over a month after the parties knew a neutral had been appointed, the Court cannot find that the arbitrator was bending to untoward pressure by "impos[ing]" an "expedited schedule." The record before the Court shows that ST was consulted on scheduling and had significant input, such that the date ultimately chosen was the later of the two earliest dates ST could participate, and significantly, only one day earlier than the date it had independently proposed.

ST has not shown any way in which it was prejudiced by the supposedly expedited schedule. Although it mentions that one effect of the *ex parte* communications was that there were no evidentiary hearings before the Procedural Neutral, the Court notes that nowhere does ST suggest, and nowhere does the record reflect, that it desired to present evidence and was somehow denied the opportunity. Moreover, the Court's examination of the record before the procedural board shows that ST made a substantial presentation. Again there is no suggestion that it was somehow inhibited in making its presentation. Finally, although ST suggests that the Arbitration Board ignored its arguments, that is plainly not the case. The award shows that the Board considered and discussed all of the arguments raised by ST in its submissions. The fact that the Board reached a result that is not to ST's liking does not mean that it was biased or violated due process.[15]

---

**15.** While acknowledging that the standard of review of arbitration awards under the RLA is sometimes informed by the articulation of standards of review of other types of arbitration awards, the Court declines ST's invitation to

apply the standard of "evident partiality" that is statutorily prescribed in the United States Arbitration Act, 9 U.S.C. § 10. As noted above, the Supreme Court has spoken clearly on this issue: "Section 153, First (q) unequivocally states that

### Counts VIII and IX

■ Count VIII alleges that the neutral arbitrator on Public Law Board No. 4462 (Procedural) was not appointed in compliance with Section 3, Second of the RLA, 45 U.S.C. § 153 Second, and thus the award is void. Count IX seeks vacation of the award on the grounds that the NMB allegedly improperly considered a letter from ST's president to be a response to the union's request for arbitration. ST specifically argues that the NMB violated its own regulations implementing the RLA by appointing the carrier member and creating Public Law Board 4462 before expiration of the statutory time period and appointing a procedural neutral before expiration of the required time. As this Court explained in dismissing the NMB, it will vacate the arbitration award only if the actions of the NMB are found to have tainted the award in a manner cognizable under the section 153 First (q). *Springfield Terminal Co. v. United Transportation Union,* 711 F.Supp. at 666. Section 153 First (q) provides for vacation of the award if the arbitration board fails to conform with the requirements of the chapter. It does not provide for similar vacation if the NMB fails to conform with the statutory requirements. Therefore, the Court will examine whether the NMB's actions constituted a violation of due process.

Section 153, Second provides in pertinent part:

> If written request is made upon any individual carrier by the representative ... of employees of such carrier for the establishment of a special board of adjustment ..., the carrier ... shall join in an agreement establishing such a board within thirty days from the date such request is made. The cases which may be considered by such board shall be defined in the agreement establishing it. Such board shall consist of one person designated by the carrier and one person designated by the representative of the employees. If such carrier or such representative fails to agree upon the establishment of such a board as provided herein, or to exercise its rights to designate a member of the board, the carrier or representative making the request for the establishment of the special board may request the Mediation Board to designate a member of the special board on behalf of the carrier or representative upon whom such request was made. Upon receipt of a request for such designation the Mediation Board shall promptly make such designation.... The members of the board so designated shall determine all matters not previously agreed upon by the carrier and the representative of the employees with respect to the establishment and jurisdiction of the board. If they are unable to agree such matters shall be determined by a neutral member of the board selected or appointed and compensated in the same manner as hereinafter provided ...

The regulations implementing the statute say virtually the same thing. 29 C.F.R. § 1200.735–1 (1988).

The UTU's General Chairman, Michael Maloof, made a written request for arbitration by letter dated January 13, 1988. On January 20, 1988, ST's President David Fink wrote to Maloof saying that he did not see the parties reaching an agreement on the issue and that he assumed they would have to be resolved by the legal system. Responding specifically to Maloof's request for arbitration, Fink stated:

> As you know, under the Railway Safety Act, the UTU has had the *unilateral* right to take issues regarding safety and

---

the 'findings and order of the [Board] shall be conclusive on the parties' and may be set aside only for the three reasons specified therein. We have time and again emphasized that this statutory language means just what it says." *Sheehan,* 439 U.S. at 93, 99 S.Ct. at 402.

The Court also has considered and hereby rejects ST's arguments that the *ex parte* communications discussed in the text constitute fraud and corruption within the meaning of those terms in the RLA. These arguments are basically a rehashing of the due process argument. In order to vacate an arbitration award on the grounds of fraud or corruption, the award must be the product of the alleged fraud or corruption. *Hayes v. Western Weighing and Inspection Bureau,* 838 F.2d 1434, 1436 (5th Cir.1988). The Court has already determined that the award here was not tainted by the *ex parte* contacts.

the rights of employees concerned about safety issues to the National Railroad Adjustment Board ("NRAB") for arbitration. This very issue was litigated by the UTU and the Boston and Maine after the UTU and the Boston and Maine just two years ago.... In this case, Federal Judge Gene Carter re-affirmed that the UTU's proper forum for the unresolved issues would have been the NRAB. It is the UTU's failure to pursue such mechanisms which, in part, rendered the job action unlawful. Had that course been followed on November 12, much of the disruptions that your members and many others have suffered would never have occurred.... You, of course, are free to pursue whatever course of action in the courts, under the Railway Labor Act or under the Federal Rail Safety Act which you feel is necessary to protect your members' interests.

(Emphasis in original). Fink then went on to describe a procedure for having the union employees return to work.

The Union forwarded this letter, along with its demand for arbitration to the NMB, requesting that the NMB appoint a carrier representative and form a Public Law Board. The NMB wrote to ST requesting comments by February 1. ST wrote back saying they would provide a formal response to Maloof's request by February 5. Thereupon, on February 2, 1988, the NMB established Public Law Board 4462 and appointed Roland Dinsmore, ST's Director of Labor Relations, as the partisan member for ST.

The Court finds that the NMB did not violate the RLA or the regulations by establishing the arbitration board and designating a partisan member. Fink's letter made the carrier's position clear. There was no reason for the NMB to expect that a formal response would diverge, in any significant policy respect, from a letter by the President and Chief Executive Officer, prompted by and specifically referring to the request for arbitration sent by the union. In fact, the February 5th letter stated that since the request was not in compliance with the RLA and the FRSA, "at this time, it would be improper for the Carrier to enter into an agreement to establish a public law board pursuant to your January 13, 1988 request." The Carrier gave as reasons for the asserted lack of compliance the issues that were ultimately decided by the procedural neutral and stated that although significant differences remained in the parties' positions concerning arbitration, that ST was amenable to further discussion. Had the NMB waited until the 5th, it would have been justified in interpreting ST's letter of that date as a reaffirmation of the carrier's decision not to agree to arbitration. The roadblocks that ST posited were of the type that plainly necessitated arbitration.

The procedures of section 153, Second of the RLA were specifically designed to "expedite grievance settlements hopelessly in arrears." *Brotherhood of Locomotive Eng'rs. v. Denver and Rio Grande Western R.R. Co.*, 411 F.2d 1115, 1118 (10th Cir.1969); House Rep. No. 1114, 89th Cong., 1st Sess. and Sen. Rep. No. 1201, 89th Cong., 2d Sess., 1966 U.S.Code Cong. & Admin.News at 2285–86. The NMB's interpretation of the governing statute to effectuate this goal is hardly objectionable, unless prejudice to one or the other of the parties can be shown. Although ST suggests that it was entitled to a thirty day waiting period to agree to arbitrate, the Court would undermine the purpose of the Act by allowing one party to use the 30 day period as a way of delaying statutorily-mandated arbitration. The statute says that the parties shall join in an agreement within 30 days. When one party makes plain before the expiration of thirty days that it will not agree, there is no violation of the statute or the regulation if the NMB proceeds to schedule the arbitration proceeding.

The parties met on February 5 and 16 again without reaching any type of agreement on any issue, including what the topics of discussion of the meetings were. By letters dated February 9 and 18, 1988 the UTU requested the appointment of a merits neutral, and by telegram on February 19, the UTU requested a procedural neutral. On February 19, by letter which re-

served its "positions that the Public Law Board was improperly convened and the dispute is not arbitrable," ST also requested the appointment of a procedural neutral. Although ST argues that the NMB violated the RLA by appointing a procedural neutral before the expiration of the required time, that claim is patently frivolous. The statute provides:

> In the event the members of the board designated by the parties are unable, within ten days after their failure to agree upon an award, to agree upon the selection of such neutral person, either member of the board may request the Mediation Board to appoint such neutral person and upon receipt of such request the Mediation Board shall promptly make such appointment.

45 U.S.C. § 153, Second. The parties had failed to agree upon anything at the February 16th meeting. Their independent requests to the NMB made quite clear that they could not agree upon the selection of a neutral. Given the impasse, the NMB acted appropriately under the statute by appointing Arbitrator Marx promptly on February 22.

Even if the RLA and implementing regulations had been violated by the NMB, ST has failed to show a due process violation which would require vacation of the award. Although ST suggests that the alleged violation of the regulations deprived ST of the minimum procedural safeguards of notice and fair hearing, both the correspondence and the record of the meetings between the parties contained in the record here belies any suggestion that ST had inadequate notice or opportunity to be heard on either formation of an agreement or appointment of a neutral. The suggestion that somehow expedition of the appointment procedure tainted the actual hearing, which was held a month and a half after the request for arbitration was made is untenable. As discussed *supra* at 38, there has been no evidence presented indicating that ST was denied an opportunity to prepare for and present its case to the procedural neutral.

*Count X*

In Count X, ST alleges that the circumscribed scope of judicial review of arbitral awards under 45 U.S.C. § 153, First (q) violates the separation of powers doctrine of the United States Constitution. Essentially, ST argues that because the FRSA requires binding arbitration under section 153 without any underlying agreement of the parties, it impermissibly empowers arbitrators, who are not Article III judges, to make virtually final decisions on matters involving statutory construction. The Court is unpersuaded by ST's argument.

In *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985), the Supreme Court held that Article III of the Constitution does not "prohibit[ ] Congress from selecting binding arbitration with only limited judicial review as the mechanism for resolving disputes among participants in FIFRA's [Federal Insecticide, Fungicide, and Rodenticide Act's] pesticide registration scheme." *Id.* at 571, 105 S.Ct. at 3328. Noting with extensive citation that it has long recognized Congress's power under Article I to vest decisionmaking authority in non-Article III tribunals, the Court stated: "Many matters that involve the application of legal standards to facts and affect private interests are routinely decided by agency action with limited or no review by Article III courts." *Id.* at 583, 105 S.Ct. at 3334. In *Thomas* the Court considered numerous factors in reaching its decision that FIFRA's binding arbitration provision did not violate Article III: whether the rights to be determined in arbitration depend on or replace similar rights under state law; the public or private nature of the rights created by the statute, the concerns motivating Congress, the availability of judicial enforcement; and the availability of review of the arbitration proceeding. Consideration of these factors in this case requires a finding that the FRSA does not violate Article III.

In *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), relied

upon by ST, the Supreme Court held only "that Congress may not vest in a non-article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review." *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. at 584, 105 S.Ct. at 3334 (1985). The portion of the FRSA under discussion here "provides essential protection for the rights of railroad employees ... ensur[ing] that certain protections of the Occupational Safety and Health Act (OSHA) are extended to railroad employees not otherwise covered by OSHA." H.R.Rep. No. 96–1025, 1980 U.S.Code Cong. & Admin.News at 3832. The FRSA employee protection provisions, therefore, were not designed to replace a state right, but rather to extend certain federal rights to railroad employees. The rights provided are similar to those provided under federal labor law. H.R.Rep. No. 96–1025, 1980 U.S.Code Cong. & Admin.News at 3840. Thus, this case differs from *Northern Pipeline.*

Traditionally, but not always, private rights have been the domain of Article III courts. Their determination in administrative fora runs the risk of encroaching on the constitutionally established power of the judicial branch. *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 854, 106 S.Ct. 3245, 3258, 92 L.Ed.2d 675 (1986). Public rights, on the other hand, might be conclusively determined by the executive and legislative branches with much less danger of such encroachment. *Id.* at 853–54, 106 S.Ct. at 3258–59. While the FRSA provides protection for individual employees, the rights established are not purely private rights. As with the rights established by FIFRA, "they serve a public purpose as an integral part of a program safeguarding the public [safety]." [16] *Thomas v. Union Carbide*, 473 U.S. at 589, 105 S.Ct. at 3337.

By choosing section 153 arbitration as the forum for disputes over hazardous working conditions, Congress adopted a method which would provide speedy and final nonjudicial resolution. *Lenfest*, 799 F.2d at 800. This objective is plainly desirable in the labor dispute context and is equally plainly valid when Congress seeks to vindicate its concern for both employee rights and rail safety. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967).

The Court must also consider whether judicial enforcement is available and whether an unwilling defendant will be subjected to judicial enforcement as a result of the agency adjudication. Judicial enforcement is, of course, available for section 153 arbitration awards. This is not a dispute with an underlying collective bargaining agreement, so ST cannot be said to have consented to the arbitration. However, as was made clear above, and in the legislative history, this same dispute could have been brought under the RLA, had the UTU so elected, in which case ST would have to have submitted to arbitration on the collective bargaining agreement and would have been deemed to have waived its Article III rights. The imposition on ST, therefore, of having to submit to arbitration under the FRSA and the possible judicial enforcement of the board's award is more theoretical than actual.

Finally, the Court notes that under the FRSA, as under FIFRA judicial review of the arbitration award is significantly limited but not precluded entirely. *Thomas v. Union Carbide*, 473 U.S. at 592, 105 S.Ct. at 3338. The limited review of the arbitration award afforded under FIFRA for fraud, misconduct or misrepresentation, and "whatever review is independently required by due process considerations," *id.*, is very similar to that permitted under section 153, First. The Court in *Thomas* found, and this Court agrees, that "the review afforded preserves 'the appropriate

**16.** The FRSA states explicitly: "The Congress declares that the purpose of this Act is to promote safety in all areas of railroad operations and to reduce railroad-related accidents, and to reduce deaths and injuries to persons and to reduce damage to property caused by accidents involving any carrier of hazardous materials." 45 U.S.C. § 421.

exercise of the judicial function.'" *Id.* (*quoting Crowell v. Benson,* 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932)).

The Supreme Court in *Thomas* held that "Congress, acting for a valid legislative purpose pursuant to its constitutional powers under Article I, may create a seemingly 'private' right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary." *Id.* at 593–94, 105 S.Ct. at 3339–40. In enacting the FRSA Congress did just that. Therefore, the arbitration prescribed by the FRSA does not contravene Article III.[17]

---

Before leaving this matter, the Court wishes to comment on the outrageously long brief filed by ST in this matter. Local Rule 19(e) provides that "[e]xcept by prior leave of Court, no memorandum of law in support of or in opposition to a ... motion for summary judgment ... shall exceed 20 pages. No reply memorandum shall exceed 5 pages." On April 18, 1990, the Court granted ST's motion to exceed the prescribed page limit, which had been filed, inappropriately, along with the brief. ST was supporting its own motion for summary judgment as well as responding to a summary judgment motion by the UTU, the brief in support of which was 24 pages. Therefore, an extension beyond the normal limits seemed justifiable. The 240 page memorandum submitted, however, was clearly an unacceptable imposition on the Court's good will.

Briefs are supposed to aid the Court in focusing and resolving the issues. They are not supposed to beat issues to death or obfuscate the real issues by giving equal prominence to tangential or totally irrelevant matters in hopes of tiring out the other party or wearing down the Court in the rigors of the decisional process. In a recent case imposing double costs for a brief that was sixty rather than fifty pages in length, the Court of Appeals stated:

> We have learned, through experience, that it is typically the *shorter* briefs that are the most helpful, perhaps because the discipline of compression forces the parties to explain clearly and succinctly what has happened, the precise legal issue, and just why they believe the law supports them. Be that as it may, we think it appropriate to discourage the filing of excessively lengthy briefs in this court. Although it is difficult to determine whether length is excessive before we hear a case, we have a more educated view thereafter. Consequently, whether or not we grant permission to file an overly long brief, we may assess special costs if we subsequently conclude that the extra length was unnecessary and did not help.

*In re M.S.V., Inc.,* 892 F.2d 5, 6 (1st Cir. 1989).

ST's brief on this motion was unnecessarily long. The case, involving as it does a review of an arbitral decision, is not exceptionally complex and the record, while extensive, was not extraordinarily so. The brief's extra length served only to distract from the valid points being made. Although the Court reached only some of the so-called due process arguments, it can say that it finds the "everything but the kitchen-sink" approach to advocacy adopted in the memorandum addressed to those issues to be unnecessary and unhelpful. A concise, focused presentation would serve both the Court and counsel much better.

ST's excessively long brief also impeded the swift resolution of this case because it presented a project of massive proportions,

---

17. In a case similar to this one, *United Transportation Union v. Consolidated Rail Corp.,* 593 F.Supp. 1346 (Special Ct., Rail Reorganization Act 1984), the court, writing after the decision in *Northern Pipeline* but before that in *Thomas,* held that Article III does not prohibit arbitration panels from resolving disputes concerning statutory rights arising under Title VII of the Rail Reorganization Act. That opinion provides additional support for the decision reached here.

which had to be postponed until an adequate block of the Court's time was available. Reading the brief was a major task, and being able to find the time to concentrate on it sufficiently to do the issues justice was difficult. All of this could have been avoided if the brief had been focused and concisely drafted. Whether motivated by profit or professional zeal, *see, H & S Realty Co. v. Donoghoe,* 765 F.Supp. 24 (D.Me.1991), briefs such as the one submitted by ST in this case are unacceptable.

Counsel must make honest efforts to comply with the page limits for briefs prescribed by the rules. If it appears that an extension may be necessary, counsel should file a motion before the date the brief is due, specifying how many pages are realistically necessary and why. Too often in the past, the Court has lightly permitted the filing of overly long briefs, to the detriment of both the Court and opposing counsel. In the future the Court may impose sanctions in the appropriate case, when the extra length is neither helpful nor necessary. *See In re M.S.V., Inc.,* 892 F.2d at 6.

Accordingly, it is ORDERED that the UTU's motion for summary judgment on Counts I, II, III, IV, V, X, and those parts of Counts VII, VIII and IX dealing with the award of the procedural board be, and it is hereby GRANTED. The award of Public Law Board 4462 (Procedural) is hereby ENFORCED. It is FURTHER ORDERED that ST's motion for summary judgment on Count VI be, and it is hereby, GRANTED. The Award of Public Law Board 4462 (Merits) is hereby VACATED, and the case is hereby remanded to Public Law Board 4462 (Merits) for a determination of the merits of the dispute between the parties.

SO ORDERED.